73 So.3d 634 (2011)
Ex parte E.R.G. and D.W.G.
(In re E.H.G. and C.L.G. v. E.R.G. and D.W.G.).
1090883.
Supreme Court of Alabama.
June 10, 2011.
*637 Randall W. Nichols and Anne Lamkin Durward of Massey, Stotser & Nichols, P.C., Birmingham, for petitioners.
Charles Cleveland, Birmingham; and Jonathan E. Lyerly, Birmingham, for respondents.
PARKER, Justice.
The petitioners, E.R.G. and D.W.G., grandparents of minor children, challenge the decision of the Court of Civil Appeals, which, among other things, upheld § 30-3-4.1, Ala.Code 1975, the Alabama Grandparent Visitation Act ("the Act"), against a constitutional challenge by E.H.G. and C.L.G., the parents of the minor children.[1]E.H.G. v. E.R.G., [Ms. 2071061, March 12, 2010] 73 So.3d 614 (Ala.Civ.App.2010). We affirm the judgment of the Court of Civil Appeals, but we do so on a rationale different from the rationale given by that court. Because the Act authorizes a court to award visitation to a grandparent whenever doing so "is in the best interests of the minor child," potentially overriding a parent's decision to deny the grandparent such visitation, without regard for the fundamental right of a fit parent to direct the upbringing of his or her child, we hold that the Act is unconstitutional.

Background
This case arises out of a dispute between the parents and the grandparents of minor children. At one time, E.R.G. and D.W.G. ("the grandparents") and E.H.G. and C.L.G. ("the parents") had a very close relationship, and the grandparents participated in the lives of both the parents and the minor children. The failure of a business shared by the father and the grandfather *638 caused financial difficulties for both families; family relationships subsequently disintegrated. The parents first restricted, and eventually terminated, the grandparents' contact with the grandchildren.
Desirous of maintaining their relationship with their grandchildren, the grandparents petitioned the Jefferson Circuit Court for visitation under the Act. The parents argued in their response to the grandparents' petition that the Act was unconstitutional both on its face and as it applied to them:
"The subject statute is constitutionally infirm because it fails to expressly provide that the parents' decision is presumed to be in the best interest of the children; it violates due process by failing to require a showing of harm to the children as a condition precedent to granting visitation; it gives grandparents a cause of action regardless [of] whether the parents' refusal of visitation is []reasonable or unreasonable, and the State has no compelling interest in establishing a cause of action for a reasonable parental denial of grandparent visitation and there is no rational relationship between the burden of such provision and any public goal."
Because the parents raised a challenge to the constitutionality of a statute, the attorney general was served. The attorney general waived further participation in the proceedings, and the trial court appointed a guardian ad litem to represent the interests of the grandchildren. The guardian at litem recommended granting the grandparents visitation with the grandchildren. Agreeing with the guardian ad litem that continued alienation from the grandparents was not in the best interest of the children, the trial court awarded the grandparents visitation rights. Its order stated:
"`The Court therefore, after having engaged the presumption in favor of the. . . parents, is convinced, through clear and convincing evidence, that the [parents'] exertion of control over the lives of the children to the extent of isolating them from their relationship with their grandparents and alienating them from an otherwise loving relationship is not in the best interest of the said minor children.'"
E.H.G., 73 So.3d at 620 (quoting the order of the trial court). The parents moved to set aside the judgment, which motion the trial court denied. The parents then appealed to the Court of Civil Appeals, and the trial court issued a stay of its visitation order pending appeal. That court reversed the judgment of the trial court and rendered a judgment in favor of the parents.
In its opinion, the Court of Civil Appeals went immediately to the constitutional question presented:
"In this appeal, this court considers whether a circuit court may constitutionally award grandparents visitation with their grandchildren over the objection of the children's fit, natural, custodial parents without providing clear and convincing evidence that the denial of such visitation would cause the children substantial harm.
"The Alabama Grandparent Visitation Act

"The Grandparent Visitation Act (`the Act'), Ala.Code 1975, § 30-3-4.1, provides, in pertinent part:
"`(b) Except as otherwise provided in this section, any grandparent may file an original action for visitation rights to a minor child if it is in the best interest of the minor child and one of the following conditions exist:
"`. . . .

*639 "`(5) When the child is living with both biological parents, who are still married to each other, whether or not there is a broken relationship between either or both parents of the minor and the grandparent and either or both parents have used their parental authority to prohibit a relationship between the child and the grandparent.
"`. . . .
"`(d) Upon the filing of an original action . . ., the court shall determine if visitation by the grandparent is in the best interests of the child. Visitation shall not be granted if the visitation would endanger the physical health of the child or impair the emotional development of the child. In determining the best interests of the child, the court shall consider the following:
"`(1) The willingness of the grandparent or grandparents to encourage a close relationship between the child and the parent or parents.
"`(2) The preference of the child, if the child is determined to be of sufficient maturity to express a preference.
"`(3) The mental and physical health of the child.
"`(4) The mental and physical health of the grandparent or grandparents.
"`(5) Evidence of domestic violence inflicted by one parent upon the other parent or the child. If the court determines that evidence of domestic violence exists, visitation provisions shall be made in a manner protecting the child or children, parents, or grandparents from further abuse.
"`(6) Other relevant factors in the particular circumstances, including the wishes of any parent who is living.'"
E.H.G., 73 So.3d at 616-17 (footnote omitted).
Although the Court of Civil Appeals correctly stated that "the Act does not expressly require a petitioning grandparent to prove that the denial of the requested visitation would cause harm to the child," 73 So.3d at 617, it went on to hold that, in accordance with the United States Constitution, petitioning grandparents must prove that the denial of the requested visitation would cause harm to the child.
In its discussion, the Court of Civil Appeals quoted from several authorities, including Justice Scalia's dissent in Troxel v. Granville, 530 U.S. 57, 91, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (Scalia, J. dissenting), that recognize that the right of parents to make decisions regarding a child's care, control, education, health, and religion, as well as with whom the child will associate, is a fundamental right that arises "as an inherent consequence of the parent-child relationship independent of any caselaw, statute, or constitutional provision." 73 So.3d at 621. Because a parent's right is fundamental, the Court of Civil Appeals held, a state must have a compelling interest before it can legislate away that right, and several states "have concluded that the only compelling interest justifying [grandparent-visitation statutes] is the prevention of harm to the child." 73 So.3d at 626. A best-interests-of-the-child standard alone is insufficient to justify infringing on the fundamental right of the parents. The Court of Civil Appeals noted that "a court cannot award grandparent visitation without clear and convincing evidence demonstrating that denial of the requested visitation would harm the child." 73 So.3d at 626. Thus, the Court of Civil Appeals held that a grandparent petitioning for visitation under the Act must prove *640 that the child will be harmed if the visitation is denied before a trial court may impinge the fundamental parental right in question. It wrote:
"Recognizing that we are not bound by the plurality opinions in [Dodd v. Burleson, 932 So.2d 912 (Ala.Civ.App. 2005) (`Dodd I')], [Dodd v. Burleson, 967 So.2d 715 (Ala.Civ.App.2007) (`Dodd II')], and L.B.S. [v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002)], we hereby adopt the reasoning of Hawk [v. Hawk, 855 S.W.2d 573 (Tenn.1993),] and the majority of cases from other jurisdictions by holding that a grandparent seeking visitation with a child over the objection of a fit, natural, custodial parent, as an initial matter, must prove by clear and convincing evidence that the denial of the requested visitation would harm the child.
"In following Hawk and similar decisions, we do not intend to minimize the relationship between grandparents and grandchildren or the valuable contributions that that relationship may make to the development of the grandchild, to which the dissent refers. 73 So.3d at 628. As stated in R.S.C. [v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001) (plurality opinion)], supra:
"`If a grandparent is physically, mentally, and morally fit, then a grandchild ordinarily will benefit from a relationship with that grandparent. That grandparents and grandchildren normally can be expected to have a special bond cannot be denied. Each can benefit from contact with the other. Among other things, the child can learn lessons of love, respect, responsibility, and family and community heritage.'
"812 So.2d at 365. However, we must acknowledge that the statutory right of a grandparent to visit with children over the objection of a fit, natural, custodial parent is only of a recent origin, appearing for the first time in this state in 1980. See Weathers v. Compton, 723 So.2d 1284, 1286 (Ala.Civ.App.1998). That right hardly stands as an enduring tradition of Western civilization on equal footing with the parental right to the custody and control of children. See J.S. v. D.W., 835 So.2d 174, 184 (Ala.Civ. App.2001), rev'd on other grounds, Ex parte D.W., 835 So.2d 186 (Ala.2002), on remand, 835 So.2d 191 (Ala.Civ.App. 2002). Consequently, although the state may have a legitimate interest in fostering the grandparent-grandchild relationship, R.S.C., 812 So.2d at 365, the state may not do so in a manner that unduly infringes on fundamental parental rights. To prevent just such overreaching, we hold that the state may overrule the objection of a fit, natural, custodial parent to grandparent visitation only in order to prevent harm to the child."
E.H.G., 73 So.3d at 628-29 (footnote omitted).
Although the plain language of the Act does not require that harm be shown, the Court of Civil Appeals judicially imposed a "harm" standard in an attempt to uphold the Act:
"In so ruling, we do not, as the dissent suggests, ___ So.3d at ___, declare the Act to be facially unconstitutional. As presently drafted, the Act requires a trial court in a grandparent-visitation case to consider `[o]ther relevant factors in the particular circumstances. . . .' Ala.Code 1975, § 30-3-4.1(d)(6). Since we hold that a showing of harm to the child resulting from the denial of visitation is a prerequisite to any award of visitation under the Act, we conclude that subsection (d)(6) necessarily encompasses that showing as a `relevant factor' *641 and that the Act is, therefore, facially valid. See L.B.S. [v. L.M.S.], 826 So.2d [178] at 185 [ (Ala.Civ.App.2002) ] (holding that the judiciary could adopt a construction of a statute that would uphold its constitutionality). We emphasize, however, that the showing of harm is not to be weighed along with the other factors in § 30-3-4.1(d)(6). Rather, consistent with L.B.S. and J.W.J. [v. P.K.R., 976 So.2d 1035 (Ala.Civ.App.2007)], a court considering a petition for grandparent visitation must first presume the correctness of the decision of a fit, natural, custodial parent as to grandparent visitation and then determine whether the petitioning grandparent has presented clear and convincing evidence that the denial of the requested visitation will harm the child. If so, the court may then weigh the other statutory factors to determine the mode and extent of grandparent visitation necessary to alleviate the harm to the child without further infringing on the fundamental rights of the parents. See L.B.S. v. L.M.S., 826 So.2d at 192 (Murdock, J., concurring in the judgment of reversal only) (noting that due process requires `that the court may order only visitation narrowly tailored to address an adjudged harm')."
E.H.G., 73 So.3d at 629. Thus, the Court of Civil Appeals held that because harm to the child can be addressed under the "other relevant factors" provision of the Act, the Act is not unconstitutional on its face. However, although it included it among the "other relevant factors" of the Act, the Court of Civil Appeals ruled that the showing of harm is not simply another factor, but must be the first factor considered to overcome the presumption of correctness attended the parent's decision to deny the requested visitation. Then, only if clear and convincing evidence is presented to show that depriving the child of visitation with the grandparent will harm the child, may the trial court consider the remaining "other relevant factors" expressly presented in the Act.

Standard of Review
This Court takes very seriously a challenge to a statute based on constitutional grounds.
"`The standard of review for determining the constitutionality of a statute was stated in State Board of Health v. Greater Birmingham Ass'n of Home Builders, Inc., 384 So.2d 1058, 1061 (Ala.1980):
"`"Before turning to the constitutional issue posed in this case, it is appropriate to reiterate the fundamental proposition that validly enacted legislation is presumed to be constitutional. As we stated in Mobile Housing Board v. Cross, 285 Ala. 94, 97, 229 So.2d 485, 487 (1969):
"`"`Every presumption is in favor of the constitutionality of an act of the legislature and this court will not declare it invalid unless in its judgment, the act clearly and unmistakably comes within the inhibition of the constitution.'
"`"We will not invalidate a statute on constitutional grounds if by reasonable construction it can be given a field of operation within constitutionally imposed limitations. See Ex parte Huguley Water System, 282 Ala. 633, 213 So.2d 799 (1968)."
"`In Home Indemnity Co. v. Anders, 459 So.2d 836, 840 (Ala.1984), this Court stated:
"`"In determining whether the act is constitutional, we are bound by the following presumption:

*642 "`"`[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law.'
"`"Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944)."
"`See Crosslin v. City of Muscle Shoals, 436 So.2d 862, 863 (Ala.1983).'
"Town of Vance v. City of Tuscaloosa, 661 So.2d 739, 742-43 (Ala.1995)."
Lunsford v. Jefferson County, 973 So.2d 327, 329-30 (Ala.2007).
We also noted in Lunsford:
"In Rice v. English, 835 So.2d 157, 162 (Ala.2002), this Court, citing Ex parte Selma & Gulf R.R., 45 Ala. 696 (1871), reiterated `the settled principle that the people have forbidden the Legislature from conducting itself in a manner inconsistent with their constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution.'"
Lunsford, 973 So.2d at 330.

The Constitutional Question
The right of parents to direct the upbringing of their children has long been recognized as fundamental by the United States Supreme Court and, therefore, as a right protected by the Fourteenth Amendment:
"The Fourteenth Amendment provides that no State shall `deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, `guarantees more than fair process.' Washington v. Glucksberg, 521 U.S. 702, 719 (1997). The Clause also includes a substantive component that `provides heightened protection against government interference with certain fundamental rights and liberty interests.' Id., at 720; see also Reno v. Flores, 507 U.S. 292, 301-302 (1993).
"The liberty interest at issue in this casethe interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the `liberty' protected by the Due Process Clause includes the right of parents to `establish a home and bring up children' and `to control the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the `liberty of parents and guardians' includes the right `to direct the upbringing and education of children under their control.' We explained in Pierce that `[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' Id., at 535. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations *643 the state can neither supply nor hinder.' Id., at 166.
"In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651 (1972) (`It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements"' (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) (`The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition'); Quilloin v. Walcott, 434 U.S. 246, 255 (1978) (`We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected'); Parham v. J.R., 442 U.S. 584, 602 (1979) (`Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course'); Santosky v. Kramer, 455 U.S. 745, 753 (1982) (discussing `[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child'); Glucksberg, supra, at 720 (`In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children' (citing Meyer and Pierce)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."
Troxel, 530 U.S. at 65-66, 120 S.Ct. 2054. This Court has also recognized the fundamental nature of parental rights. In Ex parte J.E., 1 So.3d 1002 (Ala.2008), for example, we noted that "`[t]he right to parent one's child is a fundamental right.'" 1 So.3d at 1006 (quoting K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003)).
The fundamental right of parents to direct the education and upbringing of their children has both substantive and procedural components:
"It is, of course, true that `freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974). There does exist a `private realm of family life which the state cannot enter,' Prince v. Massachusetts, 321 U.S. 158, 166 (1944), that has been afforded both substantive and procedural protection."
Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (footnotes omitted). The substantive component of this right includes broad authority to make decisions concerning the "care, custody, and control," Troxel, 530 U.S. at 66, 120 S.Ct. 2054, of the child: "For centuries it has been a canon of the common law that parents speak for their minor children. So deeply imbedded in our traditions is this principle that the Constitution itself may compel a State to respect it." Parham v. J.R., 442 U.S. 584, 621, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (Stewart, *644 J., concurring) (footnote omitted). That substantive due-process right of parents includes the right to make decisions regarding the child's companions.
The substantive fundamental right of parents to make decisions regarding the "care, custody, and control" of their children is premised on the legal presumption that fit parents act in the best interests of their children:
"[T]here is a presumption that fit parents act in the best interests of their children. As this Court explained in Parham [v. J.R., 442 U.S. 584 (1979) ]:
"`[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.' 442 U.S., at 602 (alteration in original) (internal quotation marks and citations omitted).'
"Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."
Troxel, 530 U.S. at 68-69, 120 S.Ct. 2054. In this context, therefore, the Constitution requires that a prior and independent finding of parental unfitness must be made before the court may proceed to the question whether an order disturbing a parent's "care, custody, and control" of his or her child is in that child's best interests.
The state's compelling interest is limited to overruling the decisions of unfit parents. As the United States Supreme Court said in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), it is only "[a]fter the State has established parental unfitness at that initial proceeding, [that] the court may assume at the dispositional stage that the interests of the child and the natural parents do diverge." 455 U.S. at 760, 102 S.Ct. 1388. Unless the parents are shown by clear and convincing evidence to be unfit, the state's interest is not compelling: "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). All "parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." 405 U.S. at 658, 92 S.Ct. 1208. In the absence of clear and convincing proof that a parent is unfit, the state's basis for intervention through the judicial system evaporates. "The State's interest in caring for the children is `de minimis' if the father is in fact a fit parent." Quilloin v. Walcott, 434 U.S. 246, 248, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).
Because parents are presumed to act in the best interests of their children, the law also presumes parental "care, custody, and control" to be superior to that of third persons under ordinary circumstances:
"The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right of custody is in the best interest *645 and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question."
Ex parte Mathews, 428 So.2d 58, 59 (Ala. 1983). That same presumption is applicable to cases involving visitation with nonparents.
State action that limits a fundamental right is generally subject to strict scrutiny. Troxel, 530 U.S. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in judgment); Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny."); Graham v. Richardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) ("It is enough to say that the classification involved... was subjected to strict scrutiny under the compelling state interest test... because it impinged upon the fundamental right of interstate movement."). Strict scrutiny generally requires that the state show a compelling interest, advanced by the least restrictive means. As the United States Supreme Court said in the context of the First Amendment: "The Government may, however, [limit a fundamental right] in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. . . . It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." Sable Commc'ns of California, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).
The nature of a compelling interest varies based on the circumstances, but it is a very stringent standard; as the United States Supreme Court said in Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972): "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to" a fundamental right. 406 U.S. at 215, 92 S.Ct. 1526 (emphasis added). Therefore, "we must searchingly examine the interests the state seeks to promote." 406 U.S. at 221, 92 S.Ct. 1526. See also Troxel, 530 U.S. at 80, 120 S.Ct. 2054 (Thomas, J., concurring) ("Here, the State of Washington lacks even a legitimate governmental interestto say nothing of a compelling onein second-guessing a fit parent's decision regarding visitation with third parties."). The decisions of the trial court and the Court of Civil Appeals here properly applied a clear-and-convincing-evidence standard, as required by Santosky, supra. The clear and convincing evidence must demonstrate, however, that the state has a compelling interest requiring interference with the rights of the parents and that that interest is being advanced by the least restrictive means. The Act fails to provide for the application of this standard.
The core of parental rights is the right of a parent to make decisions about the upbringing of his or her child. In particular, the common law permitted parents to determine their children's companions: "[T]he common law rule is that parents have a `paramount right ... to custody, care and nurture of their children'... and that right includes the right to determine with whom their children shall associate." McIntyre v. McIntyre, 341 N.C. 629, 631, 461 S.E.2d 745, 748 (1995) (quoting Petersen v. Rogers, 337 N.C. 397, 402, 445 S.E.2d 901, 903 (1994)). *646 Unlike parents, grandparents had no rights in regard to their grandchildren at common law. "Under common law principles, grandparents lacked any legal right to visitation and communication with the grandchildren if such visitation was forbidden by the parents." Ex parte Bronstein, 434 So.2d 780, 782 (Ala.1983). Therefore, the rights of grandparents to visitation with their grandchildren exist only as created by the Act; they are purely statutory. "Alabama is a common law state, and there is no question that the common law did not allow grandparents a legal right of visitation." 434 So.2d at 783. Even in jurisdictions that disagreed with that principle, grandparent visitation was limited. "At common law, grandparents could be entitled to court-ordered visitation with a minor child only when special circumstances were shown." Bush v. Squellati, 122 Ill.2d 153, 155-56, 522 N.E.2d 1225, 1226, 119 Ill.Dec. 366, 367 (1988). Because grandparents lacked the right to direct the upbringing of their grandchildren, there was no legal presumption that the grandparents' actions were in the child's best interest.
As the Illinois Supreme Court said in Bush: "`It is a familiar rule of construction that statutes in derogation of the common law cannot be construed as changing the common law beyond what is expressed by the words of such statute or is necessarily implied from what is expressed.'" 122 Ill.2d at 161, 522 N.E.2d at 1229, 119 Ill.Dec. at 370 (quoting Russell v. Klein, 58 Ill.2d 220, 225, 317 N.E.2d 556, 559 (1974)). See § 1-3-1, Ala.Code 1975 ("The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature."). Therefore, we continue to apply the common law to deny grandparents' requests for court-ordered visitation except to the extent that the common law has been modified by a statute that is constitutional.
The legislature modified the common law by means of the Act, creating in grandparents a limited right to visitation with their grandchildren. In order for a grandparent-visitation statute to pass constitutional muster, it must recognize the fundamental presumption in favor of the rights of the parents. The Act, however, and particularly § 30-3-4.1(d), makes no mention of the fundamental right of parents. Instead, it instructs the trial court to "determine if visitation by the grandparent is in the best interests of the child." The "wishes of any parent who is living" are merely among the "[o]ther relevant factors" the court should "consider." § 30-3-4.1(d)(6), Ala.Code 1975. As noted above, a parent's right is fundamental, and a limitation on that right must be subject to strict scrutiny. To be constitutional, the Act must infringe upon the parent's right only to the extent necessary to protect a compelling state interest and must do so in a narrowly tailored way, using the least restrictive means. This it fails to do. To the contrary, even the litigation resulting from a grandparent's attempt to gain visitation under the Act burdens this fundamental right, regardless of the outcome, as the Illinois Supreme Court noted when considering a similar statute:
"The significant interference that section 607(b)(1) has on parents' fundamental right is further evidenced by the procedure contemplated by the statute. The grandparents may file a petition for visitation under certain circumstances: in this case, where the parents are divorced. The parent or parents are then haled into court. The parents must presumably *647 hire attorneys, and then present evidence and defend their decision regarding the visitation before a trial court. The parents' authority over their children is necessarily diminished by this procedure. This can only be characterized as a significant interference with parents' fundamental right to make decisions regarding the upbringing of their children."
Lulay v. Lulay, 193 Ill.2d 455, 474-75, 739 N.E.2d 521, 531-32, 250 Ill.Dec. 758, 769 (2000). This is no less true for requests for visitation brought under the Act. The Troxel Court reached a similar conclusion: "[T]he burden of litigating a domestic relations proceeding can itself be `so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.'" 530 U.S. at 75, 120 S.Ct. 2054 (Justice O'Connor for the Court, quoting Justice Kennedy's dissent, 530 U.S. at 101, 120 S.Ct. 2054).
The reliance in the Act on the best-interests-of-the-child standard does not protect the fundamental right of parents, even though it is that right that is at issue. Instead of recognizing the substantive and procedural rights of parents, fundamental in nature and protected by the Due Process Clause of the Fourteenth Amendment, the Act looks only to the interests of the child. Those interests are incredibly important, to be sure, but, absent more, they do not rise to the level of a compelling state interest. Furthermore, application of a best-interests standard substitutes the judge for the parent as the decision-maker, without regard for parental rights, again without a compelling interest. Because no compelling interest is required by the Act and because there is no showing that application of the Act is the least restrictive means of achieving any state interest, the Act violates a parent's fundamental right.
We do not deny the valuable role played by grandparents in the lives of many grandchildren. We share the sentiments expressed by the Supreme Court of West Virginia:
"It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known."
Petition of Nearhoof, 178 W.Va. 359, 364, 359 S.E.2d 587, 592 (1987) (quoting Mimkon v. Ford, 66 N.J. 426, 437, 332 A.2d 199, 204-05 (1975)).
There is no evidence in this case, however, indicating that the State has a compelling interest in forcing interaction between the grandparents and the grandchildren over the objections of the parents. And even if such a case were before usi.e., a case showing such a compelling state interestthe Act applies in any case where the best interests of the child indicate that visitation with a grandparent might be appropriate, without any regard for the parents' fundamental rights. This failure of *648 the Act to include a presumption in favor of the parents when deciding questions of visitation infringes on the constitutional right of parents to direct the upbringing of their children, and the Act is therefore fatally flawed and unconstitutional.[2]
Nor can the Act be saved by simply striking subparagraph (d); that subparagraph alone provides a standard for a court to use in determining appropriate visitation, and, in its absence, the Act is no longer functional. Where an essential element of a statute is declared unconstitutional, the entire statute must be rejected:
"Under these well-established principles, the judiciary's severability power extends only to those cases in which the invalid portions are `"not so intertwined with the remaining portions that such remaining portions are rendered meaningless by the extirpation."' Hamilton v. Autauga County, 289 Ala. 419, 426, 268 So.2d 30, 36 (1972) (quoting Allen v. Walker County, 281 Ala. 156, 162, 199 So.2d 854, 860 (1967)). If they are so intertwined, it must `"be assumed that the legislature would not have passed the enactment thus rendered meaningless."' Id. In such a case, the entire act must fall."
State ex rel. Jeffers v. Martin, 735 So.2d 1156, 1159 (Ala.1999). Because, in the absence of the operative portionparagraph (d)the Act cannot give sufficient guidance to the courts regarding visitation proceedings, we declare the entire Act unconstitutional and therefore unenforceable.
The grandparents argue that the decision of the Court of Civil Appeals does not consider the parameters established in Troxel, supra, in which the United States Supreme Court ruled a visitation statute of the state of Washington unconstitutionally overbroad. The grandparents correctly argue that the Court in Troxel did not apply a strict-scrutiny analysis or require the harm standard, but required only that "special weight" be given to the determination of a fit parent as to what is in the best interests of the child. The Court stated:
"[W]e do not consider the primary constitutional question passed on by the Washington Supreme Courtwhether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context."
530 U.S. at 73-74, 120 S.Ct. 2054. The Court also stated:
"In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination."
Troxel, 530 U.S. at 70, 120 S.Ct. 2054. It is precisely that "special weight" that is lacking in the Act.
The constitutional issue presented in this case is not about the holding of Troxel, however. It is about when a state may impinge upon the fundamental right of a fit, natural parent to decide which associations *649 are in the best interests of his or her children. "[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651 (1972)." Troxel, 530 U.S. at 66, 120 S.Ct. 2054 (emphasis added). Further, "`there is a presumption that fit parents act in the best interests of their children.'" L.B.S., 826 So.2d at 191 n. 7 (Murdock, J., concurring in the judgment of reversal only) (quoting Troxel, 530 U.S. at 68, 120 S.Ct. 2054).
The State must have a compelling interest to justify encroaching on the fundamental right of a parent to decide what is in the best interests of his or her child. The Act grants no deference to that fundamental right, however, and fails to limit the operation of the Act to those cases where there is a compelling state interest, instead requiring the court to decide visitation disputes between parents and grandparents based only on "the best interests of the child."
The grandparents correctly note that this Court should interpret the Act to effect the intent of the legislature. The Court of Civil Appeals held that the Act could withstand this constitutional challenge if certain requirements are judicially imposed on its application. We disagree. This Court has previously discussed this issue of affording a statute constitutionality by judicial imposition of additional requirements:
"We are, of course, aware of the elementary principle that, where the validity of a statute is assailed, and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other it would be valid, the court should adopt the construction which would uphold it. When the constitutionality of a statute is questioned, it is the duty of the courts to adopt a construction that will bring it in harmony with the Constitution, if its language will permit, even though the construction which is adopted does not appear to be as natural as the other. State ex rel. Collman v. Pitts, Probate Judge, 160 Ala. 133, 49 So. 441, 686, 135 Am. St. Rep. 79 [ (1909) ]. There are, however, limitations to the application of these principles, and the courts are not at liberty in order to sustain a statute to give it a forced construction or to read into it and interpolate words which do not appear in the language enacted by the Legislature. 6 R.C.L. p. 79, § 77.
"There is also an obligatory duty of the courts, which are vested with the power to pass upon the constitutionality of statutes, to not overlook or disregard constitutional demands, which the judges are sworn to support, and therefore, when it is clear that a statute transgresses the authority vested in the Legislature by the Constitution, it is the duty of the courts to declare the act unconstitutional, and from this duty they cannot shirk without violating their oaths of office. 6 R.C.L. p. 72, § 69."
McCall v. Automatic Voting Mach. Corp., 236 Ala. 10, 13, 180 So. 695, 697 (1938) (some emphasis added).
Section 43, Ala. Const.1901, states, in part, that "the judicial [department] shall never exercise the legislative and executive powers, or either of them." This Court has also stated that "it is our job to say what the law is, not to say what it should be.... To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers." DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998). Although we recognize that "a court should refrain from invalidating more of the statute than is *650 necessary," Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion), no part of the Act defers to the fundamental right of the parent or to the presumption in favor of a parent's decisions regarding grandparent visitation.

Conclusion
In summary, the trial court awarded the grandparents visitation based on the best-interests-of-the-child standard in the Act. The Court of Civil Appeals held that, although the Act was not unconstitutional on its face, it was unconstitutional as applied to the parents because the grandparents were awarded visitation without a showing of harm to the children caused by denying the grandparents visitation. We, however, declare the Act unconstitutional in its entirety, because "the [A]ct clearly and unmistakably comes within the inhibition of the constitution." Mobile Housing Bd. v. Cross, 285 Ala. 94, 97, 229 So.2d 485, 487 (1969). Because the rationale of this Court, albeit a different rationale than that relied on by the Court of Civil Appeals, supports the judgment of the Court of Civil Appeals, we affirm the judgment of the Court of Civil Appeals. Because of our resolution of this case, we pretermit any discussion of the other issues presented by the parties.
AFFIRMED.
WOODALL and WISE, JJ.,[*] concur.
PARKER and MURDOCK, JJ., concur specially.
STUART, BOLIN, and SHAW, JJ., concur in the result.
COBB, C.J., and MAIN, J.,[*] dissent.
PARKER, Justice (concurring specially).
I concur specially to write on the origin of the fundamental right of parents to direct the upbringing and care of their children. The main opinion in this case references Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), for the principle that parents have a fundamental right to direct the care and upbringing of their children. This right does not originate with Troxel, however; it has existed for millennia, an integral part of the institution of the family.

I. The family preexisted the state.
The family was the first of all human institutions. One man and one woman came together in covenant before God, and they, with the children God gave them, became the first human social structure. As William Blackstone wrote, "single families... formed the first natural society," becoming "the first though imperfect rudiments of civil or political society." 1 William Blackstone, Commentaries on the Law of England *47 (1765). There was no state: no one person had been given civil authority over another, to punish evil and to prevent oppression. Nor was there a church to provide structure and order in the worship of the Creator. Both of these necessary institutions would come later indeed, they were prefigured in the discipline and worship of the familybut the "sacred" relationships, Montgomery v. Hughes, 4 Ala.App. 245, 58 So. 113 (1911), within the family came first.

II. The family, like the state and the church, is a legitimate governing authority within its own sphere.
The family is a separate and legitimate human government within its proper sphere. Like the state and the church, it possesses supreme authority within its *651 own legitimate bounds, with the rights and duties of its members ordained by "a higher authority." Ex parte Sullivan, 407 So.2d 559 (1981). As John Locke wrote:
"But these two powers, political and paternal, are so perfectly distinct and separate; are built upon so different foundations, and given to so different ends, that every subject that is a father, has as much a paternal power over his children, as the prince has over his: and every prince, that has parents, owes them as much filial duty and obedience, as the meanest of his subjects do to theirs; and can therefore contain not any part or degree of that kind of dominion, which a prince or magistrate has over his subject."
John Locke, Two Treatises of Government § 71. Family and state are separate yet overlapping, and each must respect the authority of the other.
Abraham Kuyper, a famous Dutch political leader, writer, and theologian, explained that the authority of the family was not dependent on the state, but independent of it, because it came directly from God.
"Behind these organic spheres, with intellectual, aesthetical and technical sovereignty, the sphere of the family opens itself, with its right of marriage, domestic peace, education and possession; and in this sphere also the natural head is conscious of exercising an inherent authority,not because the government allows it, but because God has imposed it. Paternal authority roots itself in the very life-blood and is proclaimed in the fifth Commandment."
Abraham Kuyper, The L.P. Stone Lectures for 1898-1899: Calvinism (Six Lectures Delivered in the Theological Seminary at Princeton), 123 (1898). Kuyper went on to equate state interference with parental rights to rebellion against proper civil government: "A people therefore which abandons to State Supremacy the right of the family ... is just as guilty before God, as a nation which lays its hands upon the rights of the magistrates." Kuyper, at 127.

III. The fundamental right of parents existed before and independently of civil government.
As our Declaration of Independence made clear, we "are endowed by our Creator with certain unalienable Rights." Those unalienable rights are not limited to "Life, Liberty, and the pursuit of Happiness"; they include all those rights that are "implicit in the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and are therefore protected by the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As the Supreme Court of Massachusetts has said: "We agree that parents possess a fundamental liberty interest, protected by the Fourteenth Amendment, to be free from unnecessary governmental intrusion in the rearing of their children." Curtis v. School Comm. of Falmouth, 420 Mass. 749, 755, 652 N.E.2d 580, 585 (1995).
The Alabama Constitution provides similar protections. See Ala. Const.1901, § 1 ("That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."), and § 36 ("That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.").
*652 The authority of parents to direct the upbringing and training of their children is a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Commonwealth of Mass., 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (cited in Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997)). Those traditions, including the common law inherited from Britain and early American law derived from it, were rooted in Christian doctrine. Blackstone wrote that "[C]hristianity is part of the laws of England." 4 William Blackstone, Commentaries *59 (1726). As Justice Story said:
"One of the most beautiful boasts of our municipal jurisprudence is, that Christianity is a part of the common law, from which it seeks sanction of its rights, and by which it endeavors to regulate its doctrines. And, notwithstanding the specious objection of one of our distinguished statesmen, the boast is true as it is beautiful. There never has been a period in which the common law did not recognise Christianity as lying at its foundations."
Joseph Story, A Discourse Pronounced Upon the Inauguration of the Author, as Dane Professor of Law, 20-21 (1829). Thomas Cooley, citing Justice Story, stated that "Christianity is a part of the common law of the State ... in this qualified sense, that its divine origin and truth are admitted...." Thomas Cooley, A Treatise on the Constitutional Limitations, 670 (1903)(emphasis in original) (quoted in Hudgins v. State, 22 Ala.App. 403, 404, 116 So. 306, 307 (1928)). This Court has also recognized the influence of Christianity, noting "that [C]hristianity is a part of the common law," Goodrich v. Goodrich, 44 Ala. 670, 673 (1870), and that "Christianity... is justly regarded, in a certain sense, as a part of the common law of the land." Goree v. State, 71 Ala. 7, 9 (1881).
The Christian doctrine emphasized the role of parents in directing their children's growth and development. From the birth of the first child, children were recognized as being a gift to parents from God (Gen. 4:1, 25; see also Psalm 127:3, stating that "children are a gift of the LORD"[3]). Speaking through Moses, God instructed children to honor their parents ("Honor your father and your mother, as the LORD your God has commanded you, that your days may be prolonged and that it may go well with you ...." Deut. 5:16), and parents to teach their children ("These words, which I am commanding you today, shall be on your heart. You shall teach them diligently to your sons...." Deut. 6:6-7). Building on the natural concern of parents regarding their children's future, the book of Proverbs encouraged parents to "[t]rain up a child in the way he should go, [e]ven when he is old he will not depart from it." Proverbs 22:6. The Apostle Paul reminded the Ephesians of this parental responsibility, instructing them to "not provoke [their] children to anger, but bring them up in the discipline and instruction of the Lord." Ephesians 6:4. And throughout Scripture, the relationship between parents and their children is used as an analogy to the relationship of God with His people ("But as many as received Him, to them He gave the right to become children of God...." John 1:12), emphasizing the significant and permanent nature of that relationship.
In the century before American independence, prominent legal scholars discussed the rights and responsibilities of parents in their writings on the law. For *653 example, Hugo Grotius, often considered the founder of modern international law,[4] affirmed the authority of parents to make decisions regarding their own children.[5] John Locke, whose works formed an essential part of the intellectual foundation for the American quest for liberty, stated that "parents have a sort of rule and jurisdiction over [their children]," a right that "arises from that duty which is incumbent on them, to take care of their off-spring."[6] Similarly, Samuel von Puffendorf,[7] a well known, 17th-century German legal scholar whose works, along with those of Locke, provided a foundation for the more famous writings of William Blackstone,[8] noted that "[f]rom marriage spring children, over whom paternal authority has been established."[9] Finally, Thomas Rutherforth, a lecturer and author whose works were noted for their influence on the development of American law,[10] argued that "since nature cannot be supposed to prescribe a duty to the parents without granting them the means, which are necessary for the discharge of such duty; it follows, that nature has given the parents all the authority, which is necessary for bringing up *654 the child in a proper manner."[11]
Post-revolutionary American law continued to respect the rights of parents. Chancellor Kent, for example, discussing the liability of parents for the contracts of their children, stated that "[w]hat is necessary for the child is left to the discretion of the parent; ... there must be a clear omission of duty ... before a third person can interfere...." 2 James Kent, Commentaries on American Law *192-93 (1826).

IV. The fundamental right of parents in American jurisprudence.
The right of parents to direct the upbringing of their children was first addressed by the United States Supreme Court in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Supreme Court concluded in Meyer that the right of the parents to have their children taught languages other than English was "within the liberty of the [Fourteenth] amendment." 262 U.S. at 400, 43 S.Ct. 625. By enacting a law prohibiting the teaching of languages other than English to children before they graduated from the eighth grade, the Nebraska "Legislature ha[d] attempted materially to interfere ... with the power of parents to control the education of their own." 262 U.S. at 401, 43 S.Ct. 625. Because "[n]o emergency ha[d] arisen which render[ed] knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed," the Supreme Court was "constrained to conclude that the statute as applied [was] arbitrary and without reasonable relation to any end within the competency of the state." 262 U.S. at 403, 43 S.Ct. 625.
Parental rights also formed the basis for the Supreme Court's decision in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), which addressed an education statute that limited a child's schooling to public schools, thereby making it impossible for parents to choose to place their children in private schools like the school run by the Society of Sisters. Citing Meyer, the Supreme Court concluded that "it [was] entirely plain that the [law] unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control," 268 U.S. at 534-35, 45 S.Ct. 571, and was therefore unconstitutional.
The rights of parents were reaffirmed in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (noting that parental rights "undeniably warrant[] deference and, absent a powerful countervailing interest, protection"), and Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (upholding "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child").
Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), although primarily decided on First Amendment religious-freedom grounds, also made reference to parental rights. Because of the Free Exercise Clause in the First Amendment, as applied to the states by the Fourteenth Amendment, Wisconsin's compulsory-education statute could not constitutionally punish Amish parents who, in keeping with their religious beliefs, did not send their children to high school. 406 U.S. at 235, 92 S.Ct. 1526. The Supreme Court also noted the overlap of the parents' religious freedom and their parental rights:

*655 "[T]his case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."
406 U.S. at 232, 92 S.Ct. 1526.
Even before Meyer and Pierce, this Court had recognized the rights of parents. In Montgomery v. Hughes, 4 Ala. App. 245, 247, 58 So. 113, 113-14 (1911), this Court wrote that "[t]he laws of nature teach us that the relation of parent and child is sacred" and that "the parent is entitled to the care and custody of his child, unless some good cause is shown why he should not have such care and custody."[12] Four decades later, this Court cited approvingly a decision of the California Supreme Court, which in turn quoted Pierce and several other cases affirming parental rights:
"`This is in line with the principle that "The essence of custody is the companionship of the child and the right to make decisions regarding his care and control, education, health, and religion", Lerner v. Superior Court, 38 Cal.2d 676, 681, 242 P.2d 321, 323 [ (1952) ], and "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 [(1925) ], supra. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter", Prince v. [Com. of] Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 [(1944)]....'"
Griggs v. Barnes, 262 Ala. 357, 363, 78 So.2d 910, 916 (1955) (quoting In re Guardianship of Smith (Howes v. Cohen), 255 P.2d 761, 762 (Cal.1953)). See also R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225, 1227-28 (Ala.1990) ("The common law deems parental care for children not only an obligation, but a fundamental right: `.... The will of the parents is controlling, except in those extreme instances where the state takes over to rescue the child from parental neglect or to save its life.'" (quoting 59 Am.Jur.2d Parent and Child § 48 at 194 (1987))). As this Court said in Ex parte Sullivan, 407 So.2d 559, 563-64 (1981): "The law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention."
State action that limits a fundamental right is generally subject to strict scrutiny. Troxel, 530 U.S. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in judgment); Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny."). Strict scrutiny generally requires that the state show a compelling interest, advanced by the least restrictive means. Graham v. Richardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) ("It is enough to say that the classification involved in Shapiro [v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969),] was *656 subjected to strict scrutiny under the compelling state interest test ... because it impinged upon the fundamental right of interstate movement.").
The courts of this State have not always respected this fundamental right. A statist philosophy that appeared briefly and sporadically in American jurisprudence in the early 20th century during the growth, worldwide, of national socialism represented an aberration from our founding principles and was quickly rejected. See Burns v. Shapley, 16 Ala.App. 297, 77 So. 447 (1917):
"The theory upon which the court proceeds in such cases is that the custody and control of the parent over his minor children is a trust committed to him by the state, and this trust is dominated by the supreme guardianship of the state as parens patriae of all infants within its border, and when the parent abuses the trust so as to endanger the welfare of the child, in such sort as to hamper or retard its development into a good citizen, the interest of society requires the state to assert its supreme guardianship and protect its ward.
"It has been said:
"`Minors are the wards of the nation, and even the control by the parent is subject to the unlimited supervisory control of the state' and that `the supreme right of the state to the guardianship of children controls the natural rights of the parent when the welfare of society or of the children themselves conflicts with parental rights.'"
16 Ala.App. at 299, 77 So. at 449 (citations omitted). The philosophy expressed by the Court of Appeals in Burns directly undermined the relationship between parents and children; under that philosophy, rather than being "ordained" by a "higher authority," Sullivan, supra, that relationship existed only as a creation of the state. That view was rejected by this Court in Griggs, supra, and by the United States Supreme Court in Meyer and Pierce, supra, decided in the decade following Burns.

V. Misuse of the best-interests-of-the-child standard.
The dissent in this case "would focus on the best interests of the child." 73 So.3d at 681 (Main, J., dissenting), but the best interests of a child normally requires protecting parental rights. A child's best interests are protected, for example, by permitting the termination of parental rights only when "`clear and convincing evidence reveals that the parents cannot, or are unwilling to, discharge [their parental] responsibilities.'" Ex parte J.R., 896 So.2d 416, 423 (2004) (quoting J.V. v. State Dep't of Human Res., 656 So.2d 1234, 1235 (Ala. Civ.App.1995)). Even then, after there is "`clear and convincing evidence that the child is dependent,'" the court "`must determine whether there exists a remedy less drastic than termination of those rights.'" Ex parte J.R., 896 So.2d at 423 (quoting Ex parte Brooks, 513 So.2d 614, 617 (Ala.1987)).
The Alabama Grandparent Visitation Act ("the Act"), and the dissent seeking to uphold it, misapply the best-interests-of-the-child standard. Although, as the dissent correctly notes, a child's best interests are considered by the courts in a wide variety of legal situations, from adoption (e.g., §§ 26-10A-24 and -25, Ala.Code 1975) to juvenile delinquency (e.g., § 12-15-101(a)(2), (a)(3), and (d), Ala.Code 1975), the best-interests-of-the-child standard is properly applied only in circumstances where the standard does not conflict with parental rights. Instead, it is applied to weigh the competing claims of *657 fit parents, or if the parents are unfit, the claims of fit potential guardians.
Where a court must make an initial determination of custody in a divorce or paternity proceeding, for example, and both parents are fit, possessing coequal fundamental rights, the best-interests-of-the-child standard guides the court in determining which of the fit parents should receive custody.
"`Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child.' Ex parte Byars, 794 So.2d 345, 347 (Ala.2001). See also Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ. App.1994) (`In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. Hall v. Hall, 571 So.2d 1176 (Ala.Civ. App.1990). The trial court's overriding consideration is the children's best interests and welfare. Santmier v. Santmier, 494 So.2d 95 (Ala.Civ.App.1986).')."
Ex parte Clark, 23 So.3d 1107, 1116 (Ala. 2009).
Similarly, when the rights of a dependant child's parents are terminated, the best-interests standard is applied by the courts to determine who should receive custody, but only after both parents are found to be unfit. As this Court said in Ex parte Beasley, 564 So.2d 950 (Ala.1990):
"In viewing the `dependency' issue in the context of the State's attempt to terminate parental rights, the State would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood. Therefore, a finding of `dependency' would be warranted, and the State would have a duty to act in accordance with that child's best interest."
564 So.2d at 954.[13] Where both parents are unfit, their parental rights no longer provide the court any guidance, and the best-interests-of-the-child standard applies to balance the claims of competing parties.
The Act ignores the first step of the analysisthe required finding of unfitnessand, instead, treats all parents as unfit and permits the court to grant grandparent visitation whenever it believes that visitation to be in the best interests of the child. The Act permits a court to use the best-interests-of-the-child standard to override the wishes of fit parents at the request of a third party and thereby to undermine the relationship of those parents with their children. This is not only unconstitutional, as discussed in the main opinion; it is also fraught with the danger of unintended consequences.
Once taken out of context, the best-interests-of-the-child standard has been used to justify a variety of inappropriate results. The best-interests standard has been misapplied, for example, to grant a *658 parent's former same-sex partner custody of or visitation with the parent's child against the parent's wishes. In Jones v. Jones, 884 A.2d 915 (Pa.Super.Ct.2005), a Pennsylvania court used the "child's best interests" to justify awarding custody to a third party over the objection of the natural parent. According to the court:
"Once it is established that someone who is not the biological parent is in loco parentis, that person does not need to establish that the biological parent is unfit, but instead must establish by clear and convincing evidence that it is in the best interests of the children to maintain that relationship or be with that person."
884 A.2d at 917. Similarly, the Washington Supreme Court ruled that a "de facto parent"a nonparent third party who played a parent-like rolewas "entitled to any parental privileges ... determined to be in the best interests of the child," even over the objections of the child's natural parents. In re Parentage of L.B., 155 Wash.2d 679, 708, 122 P.3d 161, 177 (2005). The Supreme Court of North Carolina reached the same conclusion, finding that because the fit parent had "acted inconsistently with her paramount parental status" by permitting the parent's former same-sex partner to have a parent-like relationship with the parent's child, a finding of unfitness was unnecessary, and the application of the best-interests-of-the-child standard was appropriate. Boseman v. Jarrell, 704 S.E.2d 494, 503, 505 (N.C. 2010). Thus, even though "this [was] not a case in which the natural parent [was] unfit, or ha[d] abandoned or neglected the child," the North Carolina Supreme Court upheld the trial court's decision to grant joint custody to the parent and the nonparent. Boseman, 704 S.E.2d at 503. Once the best-interests-of-the-child standard is cut loose from its mooring, from its proper place in American jurisprudence, it can drift, taking on a life of its own, leading to unintended and often undesirable results.[14]

VI. Conclusion.
There is no evidence before us to show that the State has a compelling interest in granting visitation in this case over the objection of fit parents or that any interest the State may have in maintaining grandparent-grandchild relationships could not be advanced by some less restrictive means. The Act is an "unnecessary governmental intrusion in the rearing of their children," Curtis, 420 Mass. at 755, 652 N.E.2d at 585, an intrusion into "the private realm of family life which the state cannot enter," Griggs, 262 Ala. at 363, 78 So.2d at 916. Moreover, the Act creates a wholly new use for the best-interests-of-the-child standard, making it a weapon for third parties to use against fit parents. The Act therefore violates the fundamental right of parents and is unconstitutional.
MURDOCK, Justice (concurring specially).
I believe this is the most important case the members of this Court have ever been asked to decide. The nuclear family is the *659 building block for Western society. How we decide this case has the farthest reaching of ramifications for the integrity of the nuclear family and the parent-child relationship that is at its core.
Any case concerning the custody of a child is among the most important this or any court can ever be called upon to consider. Here, the custody issue concerns grandparent visitation. As important as this issue is in its own right, the manner in which we choose to analyze itespecially if we were to analyze it in a manner consistent with the statute at issuewill have ramifications far beyond the issue of grandparent visitation. Ultimately, this case pits the integrity of the nuclear family and the parent-child relationship against the power of the government to intrude upon the nuclear family, to override fit custodial parents' choices for their children, and to take on the role of a "village" that decides how our children should be raised.

I.
I am a grandparent.
I also note that, as a child, I was blessed to know the love of three grandparents, one of whom in particular was like a second mother to me during early parts of my life and remained a vital influence on me throughout my childhood.
It is with a deep appreciation for the love and special bonds that can and should exist between grandparents and their grandchildren that I, like the other members of this Court today, affirm the vital role that grandparents doand should play in the lives of their grandchildren, and vice versa. See R.S.C. v. J.B.C, 812 So.2d 361, 365 (Ala.Civ.App.2001) (plurality opinion I authored as a judge on the Alabama Court of Civil Appeals).
The question whether grandparents should have a "right" to visit with their grandchildren, however, is often assumed by the casual observer to be something different than it is. Upon initially being confronted with the issue, many (including myself some 10 years ago as a judge on the Court of Civil Appeals) are tempted to respond reflexively and affirmatively based on thoughts of the kind, loving grandparents we were blessed to have in our lives as children (or are attempting to be as adults) and on relatively brief visits at grandmother's house, often with parents present. Ultimately, however, the question presented is whether the government has the power to mandate, through the use of force if necessary, the physical removal of children from fit custodial parents and to do so under circumstances that could be much different than those described above.
Parents might decide that their infant son should not spend unsupervised time with his grandmother because of a concern about the grandmother's driving ability or her inability to manage stairs in her home. Parents might limit the visitation of their daughter with a grandfather to brief periods when one of the parents can be present because of concerns that the grandfather suffers from dementia or some mental illness he fails or refuses to recognize, because of suspected child-abuse tendencies, or because his manner of interaction with the children is less than kind. Sometimes there is objective evidence of such matters, evidence that would be competent in a courtroom. Sometimes there is not. Sometimes there is only a reasonable suspicion or a mother's intuition.
Moreover, at issue here is not just Sunday afternoon visits for a few hours at grandmother's house. The power to order visitation includes the power to physically remove children from their parents and place them in a temporary custodial relationship *660 with another adult for days or even weeks at a time. What is at issue here is the ability of the government, over the objection or even fears of loving and caring parents, and over any objection or fears of the child himself or herself, to mandate that the child be physically removed from the presence of his or her parents and placed unsupervised with another adult, merely because the government decides "it is better this way."
Unless a parent has been deemed unfit or has voluntarily forfeited custody of his or her child, the law rightly assumes that the parent wants what is best for the child and that, if the parent restricts the child's relationship with some person, even a grandparent, the parent has a valid reason for doing so and need not defend that reason to the government.[15] Admittedly, we live in a fallen world. All is not perfect. The parent may well get it wrong. Then again, parents do that all the time. But if parents can get it wrong, how much more so the government? As between fit parents and the government, I must choose the parents. If we allow the government the power to decide what is in a child's "best interest" and to enforce that decision over the objection of such parents, we have allowed the government to assume a frightening power.[16]
I absolutely do not see how this or any court can hold constitutional a statute that, like the one before us, empowers the government to mandate, and achieve by force if necessary, the physical removal of a child from his or her fit custodial mother and father and the physical placement of that child, even temporarily, with some other person, over the objections of that child's parents merely because the government differs with the parents as to what would be in the child's best interests. To empower the government in this manner would be to make the government into the "over parent" of every child in its jurisdiction and to deprive the child's mother and father of their God-given role.

II.
The United States Supreme Court has held that the Due Process Clause of the United States Constitution
"guarantees more than fair process, and the `liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. Reno v. Flores, 507 U.S. 292, 301-302 (1993); [Planned Parenthood of Southeastern Pa. v.] Casey, 505 U.S. [833,] 851 [ (1992) ]. In a long line of cases, we have held that, in *661 addition to the specific freedoms protected by the Bill of Rights, the `liberty' specially protected by the Due Process Clause includes the rights ... to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942), [and] to direct the education and upbringing of one's children, Meyer v. Nebraska, 262 U.S. 390 (1923); Pierce v. Society of Sisters, 268 U.S. 510 (1925) ....
". . . .
". . . [W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,' [Moore v. East Cleveland, 431 U.S. 494,] 503 [ (1977) ] (plurality opinion); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) (`so rooted in the traditions and conscience of our people as to be ranked as fundamental'), and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed,' Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937). . . . Our Nation's history, legal traditions, and practices thus provide the crucial `guideposts for responsible decision making,' Collins [v. Harker Heights, 503 U.S. 115,] 125 [(1992)], that direct and restrain our exposition of the Due Process Clause. As we stated recently in Flores, the Fourteenth Amendment `forbids the government to infringe ... "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.' 507 U.S., at 302."
Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (some citations and some emphasis omitted; emphasis added); see also Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("There does exist a `private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection." (quoting Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (footnotes omitted))). As the Supreme Court explained in Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the liberty guaranteed by the Fourteenth Amendment "denotes not merely freedom from bodily restraint but also the right of the individual... to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."
Although the United States Supreme Court's decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), is generally referred to as a plurality decision, a majority of the Justices recognized that the State's attempt to impose grandparent visitation over the objection of the parent in that case implicated the fundamental right of the parent. 530 U.S. at 95, 120 S.Ct. 2054 (Kennedy, J., dissenting) ("[T]here is a beginning point that commands general, perhaps unanimous, agreement in our separate opinions: As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child. The parental right stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment.").[17]
*662 It cannot be disputed that § 30-3-4.1, Ala.Code 1975, infringes on the ability of parents to make decisions as to the care, custody, and control of their children. Thus, as the main opinion reflects, a so-called "strict-scrutiny" analysis applies. The State must show a compelling state interest and must also show that § 30-3-4.1 and any remedy flowing therefrom are narrowly tailored to address that compelling state interest. See Glucksberg, supra; see also Troxel, 530 U.S. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in the judgment). Section 30-3-4.1 fails as to both elements.
The dissent correctly notes that Troxel did not hold that a showing of "harm" was a necessary component of a statute authorizing courts to order grandparent visitation. We must keep in mind two things, however. First, as the Troxel plurality made clear, the Troxel Court simply did not find it necessary to reach this issue in the case before it. Second, what that Court clearly did reach, and what it clearly expressed, was that a showing merely of "best interests" is not enough. Yet, if we uphold the Alabama statute before us, that is exactly what this Court will be saying is enough. See Ala.Code 1975, § 30-3-4.1 ("[T]he court shall determine if visitation by the grandparent is in the best interests of the child.").
Statements in Troxel that make it clear that the State cannot override a fit parent's decision based merely on a "best-interest" standard begin with the Court's recognition of the absolutely critical nature of parents' rights in relation to their children:
"The Fourteenth Amendment provides that no State shall `deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, `guarantees more than fair process.' Washington v. Glucksberg, 521 U.S. 702, 719 (1997). The Clause also includes a substantive component that `provides heightened protection against government interference with certain fundamental rights and liberty interests.' Id., at 720; see also Reno v. Flores, 507 U.S. 292, 301-302 (1993).
"The liberty interest at issue in this casethe interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the `liberty' protected by the Due Process Clause includes the right of parents to `establish a home and bring up children' and `to control the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the `liberty of parents and guardians' includes the right `to direct the upbringing and education of children under their control.' We explained in Pierce that `[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' Id., at 535. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Id., at 166.

*663 "In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651 (1972) (`It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements"' (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) (`The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition'); Quilloin v. Walcott, 434 U.S. 246, 255 (1978) (`We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected'); Parham v. J.R., 442 U.S. 584, 602 (1979) (`Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course'); Santosky v. Kramer, 455 U.S. 745, 753 (1982) (discussing `[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child'); Glucksberg, supra, at 720 (`In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children' (citing Meyer and Pierce)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."
530 U.S. at 65-66, 120 S.Ct. 2054 (emphasis added). The Troxel Court then makes clear that the government cannot override a fit parent's choices for his or her children merely because the government thinks it can make a "better decision" than the parent as to what is in the child's "best interests":
"Section 26.10.160(3), as applied to Granville and her family in this case, unconstitutionally infringes on that fundamental parental right. The Washington nonparental visitation statute is breathtakingly broad. According to the statute's text, `[a]ny person may petition the court for visitation rights at any time,' and the court may grant such visitation rights whenever `visitation may serve the best interest of the child.' § 26.10.160(3) (emphases added [in Troxel]). That language effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review. Once the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference. Section 26.10.160(3) contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn any decision by *664 a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests. The Washington Supreme Court had the opportunity to give § 26.10.160(3) a narrower reading, but it declined to do so. See, e.g., 137 Wash.2d, at 5, 969 P.2d, at 23 (`[The statute] allow[s] any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm'); id., at 20, 969 P.2d, at 30 (`[The statute] allow[s] "any person" to petition for forced visitation of a child at "any time" with the only requirement being that the visitation serve the best interest of the child').
". . . .
". . . Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. See, e.g., [Reno v.] Flores, 507 U.S. [292], at 304 [ (1993) ].
". . . .
". . . As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made. Neither the Washington nonparental visitation statute generallywhich places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be grantednor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional."
Troxel, 530 U.S. at 65-73, 120 S.Ct. 2054 (some emphasis omitted; some emphasis added).
As Justice Thomas explained in his concurring opinion in Troxel:
"I agree with the plurality that this Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case. Our decision in Pierce v. Society of Sisters, 268 U.S. 510 (1925), holds that parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them. The opinions of the plurality, Justice KENNEDY, and Justice SOUTER recognize such a right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringements of fundamental rights. Here, the State of Washington lacks even a legitimate governmental interestto say nothing of a compelling onein second-guessing a fit parent's decision regarding visitation with third parties. On this basis, I would affirm the judgment below."
Troxel, 530 U.S. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in the judgment) (emphasis added).
It is clear from these passages that the government is not free to override the choice of fit custodial parents as to their children's associations merely because the government thinks it can reach a "better decision" than the children's parents.
"`Among those interests lying at the core of parents' rights to raise and care for their own children is the right to control their children's companions and associations.' R.S.C. v. J.B.C., 812 So.2d 361, 368 (Ala.Civ.App.2001). As noted in J.S. v. D.W., 835 So.2d 174, 182 (Ala.Civ.App.2001), reversed on other *665 grounds, 835 So.2d 186 (Ala.2002), `[t]he common law recognized the right of parents to determine with whom their child would associate.' See also M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (`[c]hoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as "of basic importance in our society," ... rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect'); Hoff v. Berg, 595 N.W.2d 285 (N.D.1999) (holding North Dakota's grandparent-visitation statute unconstitutional on the ground that it burdened the parents' fundamental right to control their children's associations)."
McQuinn v. McQuinn, 866 So.2d 570, 579 (Ala.Civ.App.2003) (Murdock, J., concurring in part, concurring in the result in part, and dissenting in part).
As Justice Thomas noted in Troxel, a "strict-scrutiny" analysis applies when a fundamental right is at issue and only a "compelling interest" of the state justifies governmental interference with such right. The notion that the state has a "compelling interest" that empowers it to decide the "best interests" of children is logically irreconcilable with the notion of a God-given and unalienable liberty interest, protected by the United States Constitution, in the right of parents to control the associations of their children.
Only the parent-child relationship holds a specially protected status under the Constitution. Once one moves beyond the child's relationship with the parent, the Constitution provides no principled distinction between a child's relationship with his or her grandparents, great-grandparents, cousins, older siblings, aunts and uncles, neighbors, etc. If we decide that the state can substitute its decision for that of a fit parent with respect to a child's visitation with a grandparent merely because the state thinks it is in the best interests of the child for it to do so, then there is nothing that prevents the state from using the same "best interests" basis to substitute its judgment for that of a fit parent as to the issue of the child's visitation with any other relative, or even a nonrelative. For that matter, if the state has a "compelling interest" in looking after the "best interests" of children, there would no longer be a constitutional basis on which to restrain government from substituting its judgment for that of a fit parent as to any issue, whether it be choice of schools, decisions as to medical care, whether to sign up the child for the soccer team or to enroll him or her in violin lessons, whether to allow the child to spend the night with friends, what is an appropriate bedtime, diet, etc. If the government can cross the line heretofore informed by the parents' fundamental right to the care, custody, and control of their children, in what new location and on what principled basis could any different line ever be drawn?
As to the fact that the Troxel decision did not reach the issue of harm, the dissent takes the position that, absent a requirement from the United States Supreme Court that a grandparent visitation act must include a harm standard in order to be constitutional, "and in the face of existing precedent from this Court and from the Court of Civil Appeals ..., I see no need to declare the Act unconstitutional." 73 So.3d at 684 (Main, J., dissenting). Respectfully, I disagree. There always is a need to declare a statute unconstitutional if this Court concludes that it is unconstitutional, if the issue is properly presented to us, and if we must reach that issue in order to decide the case. The United States Supreme Court in Troxel, as it does in many cases, had the luxury under the circumstances in that particular case of *666 going only "so far" in order to dispose of the immediate case before it. State courts such as ours, in cases such as this, often do not have that luxury; real decisions need to be made in real cases without the luxury of waiting on the United States Supreme Court to make its next pronouncement. The United States Supreme Court acknowledged as much when it stated that "much state-court adjudication in this context occurs on a case-by-case basis," 530 U.S. at 73, 120 S.Ct. 2054, citing as examples the Maryland case of Fairbanks v. McCarter, 330 Md. 39, 49-50, 622 A.2d 121, 126-27 (1993), and the Virginia case of Williams v. Williams, 256 Va. 19, 21, 501 S.E.2d 417, 418 (1998), and noting that the latter case "interpret[ed] Virginia[`s] nonparental visitation statute to require a finding of harm as condition precedent to awarding visitation."[18] 530 U.S. at 74, 120 S.Ct. 2054.
Consistent with the need for state appellate courts to make decisions on constitutional matters without prior guidance from the United States Supreme Court, the Court of Civil Appeals was required in a number of cases during my tenure on that court to address the same fundamental issue that is presented to us today. In the lead opinion in R.S.C. v. J.B.C., 812 So.2d 361, 364-65 (Ala.Civ.App.2001), I expressed the view that, as a prerequisite to court-ordered, unsupervised grandparent visitation, there must be a showing that there would be "harm or potential harm to the child if such visitation is not allowed."[19] 812 So.2d at 372. The following year I wrote specially in L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only; joined by Yates, P.J.), to express my view that grandparent visitation may be ordered only upon a threshold showing by "clear and convincing evidence" of "substantial harm to the child if the requested visitation is not granted." 826 So.2d at 188. I further asserted that the interference permitted in such circumstances must be that which is "least restrictive of the fundamental right and most *667 closely tailored to serve [the] compelling state interest" in preventing the harm in question.[20] 826 So.2d at 192. The views I *668 expressed in R.S.C. and L.B.S. were further refined in Beck v. Beck, 865 So.2d 446 (Ala.Civ.App.2003) (Murdock, J., concurring in the result), in which I suggested as follows:
"[W]hile § 30-3-4.1 attempts to open the door for courts to impose grandparent visitation against the wishes of a fit parent, the United States Constitution requires that that door be all but closedremaining only slightly ajar for those egregious cases where it is `clear' that `substantial harm' will come to the child absent judicial intervention.2
"2 This `opening' may, for example, be wide enough to allow the application of § 30-3-4.1 to cases in which a grandparent has served for a significant period as a child's de facto parent, so that depriving the child of a continuing relationship with that grandparent would cause serious psychological or emotional harm to the child. See L.B.S. [ v. L.M.S.], 826 So.2d [178] at 191-92 n. 8 and accompanying text (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only)."
865 So.2d at 451.
Based upon my consideration of this question since my participation in the foregoing cases, including my consideration of the various statutes adopted by the legislature over the past 30 years in several unsuccessful attempts to address this issue in a manner consistent with constitutional dictates, I have come to the conclusion that the wiser and more prudent courseand, more importantly, the course dictated by the respect and protection required by our Constitution to the unalienable right of fit custodial parents to raise their children and control their associationswould be an approach consistent with the approach suggested by Judge Crawley in his concurring opinion in R.S.C. v. J.B.C., 812 So.2d 361, 373 (Ala.Civ.App.2001) (Crawley, J., concurring in the result):
"I agree with the discussion of the applicable legal principles. However, I conclude that Ala.Code 1975, § 30-3-4.1, is per se, or facially, unconstitutional. The opinion recognizes that a fit parent has a fundamental right `in the absence of harm or potential harm to the child' to determine when a grandparent may visit his or her child and that § 30-3-4.1 is not narrowly tailored to protect that fundamental right. 812 So.2d at 372. I agree with that reasoning except for the phrase I quoted above`in the absence of harm or potential harm to the child.' Our state has a procedure for protecting children from harmthe invocation of dependency jurisdiction. See Ala.Code 1975, § 12-15-1 et seq., and § 26-18-1 et seq. See also my opinion concurring in the result in J.S. v. D.W., 835 So.2d 174 (Ala.Civ.App.2001)[, rev'd, Ex parte D.W., 835 So.2d 186 (Ala.2002) ]."
I refer to an approach "consistent with" the approach suggested in Judge Crawley's special writing in R.S.C. because I would add to Judge Crawley's explanation of the availability of "dependency jurisdiction" for the protection of children from harm the fact that the State also provides for that purpose the forfeiture and unfitness standards discussed in Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), and its *669 progeny. As the Court explained in Terry:
"`The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"
Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)) (some emphasis omitted).[21]
I also offer the following comments in relation to various comments in the dissenting opinion:
First, at both its outset and near its conclusion, the dissenting opinion speaks of the necessity of the State's acting when children are in need of "protection." The term "protection" necessarily implies the existence of something from which the child needs to be protected, i.e., "harm." I do not believe that this Court ever has recognized the power of the government to "protect" children from not being the recipients of the "best" decisions that could be made for them. If that is the law, I respectfully observe that there are not enough file folders, filing cabinets, courtrooms, judges, or hours in the day for the courts of this State to address the virtually infinite number of decisions made by fit parents every day that could be challenged as not being in their children's "best interests." See Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.... [But] [s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.").
Second, I respectfully submit that the dissent overlooks the necessity of harm or potential harm to children as a prerequisite to action by the State of Alabama in the following matters that it references: (1) termination of parental rights, (2) dependency proceedings, (3) custody proceedings, (4) adoption proceedings, and (5) abortions sought by minors.
In the first two of thesedependency and termination of parental rightsthe law is clear that the State may not act unless the child is dependent upon the State for care and supervision. As the dissent notes, § 12-15-314(a)(4), Ala.Code 1975, expressly provides for a "best interests" determination by a court only "`after adjudicating a child dependent.'" 73 So.3d at 680 (quoting D.B. v. K.B., 67 So.3d 114 (Ala.Civ.App.2011)). See Ala. Code 1975, § 12-15-102(8) (describing the circumstances that warrant a finding of dependency). Of course, parental rights *670 cannot be terminated absent a showing that the parent is either unable or unwilling to fulfill his or her parental obligations toward a child, i.e., that the parent has placed the child at risk of serious harm or is unable to protect the child from such harm. See Ala.Code 1975, § 12-15-319.
As for the reference in the dissent to custody disputes, to the extent that reference is made in relation to custody disputes between two fit parents, the authority cited there is inapposite. As to a custody dispute between a parent and a third party, if the third party is to prevail there must be a showing of either "`voluntary forfeiture of [parental rights or]... that the parent ... is guilty of ... misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d at 59). See also Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982) (concluding that the Court of Civil Appeals had applied the wrong legal standard and, rather than respecting the prima facie right of the natural parent by merely inquiring as to whether the natural parent was fit, had gone a step further and had erroneously inquired into who, as between the natural parent and a nonparent, was "the fittest of the two for custody of the child" (emphasis added)).
As to adoption proceedings, the State cannot and does not reach the decision whether the adoption is in the best interest of the child until after the child's natural parent either has consented or the parental rights of that parent have been terminated. See above regarding the standard for termination of parental rights.
Finally, a court cannot decide that it is in a child's best interest to obtain an abortion without the consent of her parent unless there is evidence supporting one of the following allegations:
"a. That the petitioner is sufficiently mature and well enough informed to intelligently decide whether to have an abortion without the consent of either of her parents or legal guardian.
"b. That one or both of her parents or her guardian has engaged in a pattern of physical, sexual, or emotional abuse against her, or that the consent of her parents, parent or legal guardian otherwise is not in her best interest."
Ala.Code 1975, § 26-21-4(d)(4). The intrusion on parental rights reflected by these statutory provisions is premised, by mandate of precedent from the United States Supreme Court, on the notion that the abortion decision is of a "unique nature" so far as the child's constitutional rights are concerned, Bellotti v. Baird, 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("[T]here are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.").[22]
*671 In the penultimate paragraph of the dissent, there is reference to the court's intervening "to protect the rights of children" and of "protecting a child if an adult has disregarded his or her responsibility toward that child." 73 So.3d at 685. I am unfamiliar with any holding by any court at any time to the effect that a child has a "right" to visit with his or her grandparent. Nor am I familiar with any holding of any court at any time to the effect that a parent has a legal "responsibility" to not make a decision that is not in the best interests of his or her child. I have no doubt that my parents did so on many occasions; I have no doubt that, as a parent, I have done so on many occasions. Mistakes are part of parenting, not a basis for intervention by the government unless they rise to a level of causing the parent to be deemed unfit to continue in that role. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Finally, the dissent criticizes the main opinion for purportedly "focus[ing] on the rights of the parents rather than on the best interests of the children." 73 So.3d at 678. In addition to the legal principles discussed above that are fully responsive to this criticism, I would add that this criticism fails to take into consideration that a parent's legal rights in relation to a child are linked to and correlative of the parent's fulfillment of legal duties toward the child.
"As the duty of support and protection to the infant, and responsibility to society for the government of the family, and the right to the care and custody of the child, and the ordering of the family, are correlative and dependent the one upon the other, if the law has taken away the rights, the duties from which the rights result, and to the performance of which the rights are essential, are abrogated; and the child is then left without lawful protectors, and society is without any security for the proper performance of important social duties."
People ex rel. Brooks v. Brooks, 35 Barb. 85, ____ (N.Y.Sup.1861). Unless a parent fails to satisfy, or is not in a position to satisfy, his or her obligations to a child, the State has no basis for intruding upon the parent's rights in relation to the care, custody, and control of the child. See Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939) (describing "the natural and legal relations between parent and child" as being "interwoven with life and liberty"); Rhodes v. Lewis, 246 Ala. 231, 20 So.2d 206 (1944) (explaining that the law does not presume that "the best interests of the child" exist in a conceptual vacuum separate from the natural rights of the parents).[23]

*672 III.
If parents have not voluntarily forfeited their parental rights or been deemed unfit, the law assumes that they want what is best for their children. The law assumes that, if a fit custodial parent restricts his or her child's association with some person, even a grandparent, the parent has a valid reason for doing so and need not defend that reason to the government. It would be naive and dangerousand antithetical to many hundreds of years of Western thoughtto view the state as possessing some moral high ground or inherently superior ability to decide a child's best interest. As between fit parents and the state, we must let parents parent their children.
Based on the foregoing, I join the majority of this Courtseven Justices, including those who concur only in the resultin concluding that § 30-3-4.1 is unconstitutional on its face.
BOLIN, Justice (concurring in the result).
I reluctantly concur in the result reached by the main opinion. Although the opinion states that "[t]he constitutional issue presented in this case is not about the holding of Troxel [v. Granville, 530 U.S. 57 (2000),]" 73 So.3d at 648, the decision here really does come down, as argued by the grandparents, through precedent regarding the recognition of the fundamental right of fit parents to make decisions concerning their children, to the uncertain legacy of the plurality opinion in Troxel.
The Alabama Legislature has shown that this State's policy is that grandparent visitation, under the proper circumstances, *673 is favored in this State, as evidenced by the legislature's multiple attempts to create a statute to so provide. Unfortunately, the legislature's most recent 2003 amendment to § 30-3-4.1, Ala.Code 1975, the Alabama Grandparent Visitation Act, failed to accommodate Troxel, which states:
"The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests. More importantly, it appears that the Superior Court applied exactly the opposite presumption. In reciting its oral ruling after the conclusion of closing arguments, the Superior Court judge explained:
"`The burden is to show that it is in the best interest of the children to have some visitation and some quality time with their grandparents. I think in most situations a commonsensical approach [is that] it is normally in the best interest of the children to spend quality time with the grandparent, unless the grandparent, [sic] there are some issues or problems involved wherein the grandparents, their lifestyles are going to impact adversely upon the children. That certainly isn't the case here from what I can tell.'
"Verbatim Report of Proceedings in In re Troxel, No. 93-3-00650-7 (Wash.Super. Ct., Dec. 14, 19, 1994), p. 213 (hereinafter Verbatim Report).
"The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be `impact[ed] adversely.' In effect, the judge placed on Granville, the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters. The judge reiterated moments later: `I think [visitation with the Troxels] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children.' Id., at 214.
"The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child. See Parham [v. J.R.], [442 U.S. 584] at 602 [ (1979) ]. In that respect, the court's presumption failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters. Cf., e.g., Cal. Fam.Code Ann. § 3104(e) (West 1994) (rebuttable presumption that grandparent visitation is not in child's best interest if parents agree that visitation rights should not be granted); Me. Rev.Stat. Ann., Tit. 19A, § 1803(3) (1998) (court may award grandparent visitation if in best interest of child and `would not significantly interfere with any parent-child relationship or with the parent's rightful authority over the child'); Minn.Stat. § 257.022(2)(a)(2) (1998) (court may award grandparent visitation if in best interest of child and `such visitation would not interfere with the parent-child relationship'); Neb.Rev. Stat. § 43-1802(2) (1998) (court must find `by clear and convincing evidence' that grandparent visitation `will not adversely interfere with the parent-child relationship'); R.I. Gen. Laws § 15-5-24.3(a)(2)(v) (Supp.1999) (grandparent must rebut, by clear and convincing evidence, presumption that parent's decision to refuse grandparent visitation was reasonable); Utah Code Ann. § 30-5-2(2)(e) (1998) (same); Hoff v. Berg, 595 N.W.2d 285, 291-292 (N.D.1999) (holding North Dakota grandparent visitation statute unconstitutional because State has no `compelling interest in presuming *674 visitation rights of grandparents to an unmarried minor are in the child's best interests and forcing parents to accede to court-ordered grandparental visitation unless the parents are first able to prove such visitation is not in the best interests of their minor child'). In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.

". . . .
"Considered together with the Superior Court's reasons for awarding visitation to the Troxels, the combination of these factors demonstrates that the visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters. The Washington Superior Court failed to accord the determination of Granville, a fit custodial parent, any material weight. In fact, the Superior Court made only two formal findings in support of its visitation order. First, the Troxels `are part of a large, central, loving family, all located in this area, and the [Troxels] can provide opportunities for the children in the areas of cousins and music.' App. 70a. Second, `[t]he children would be benefitted from spending quality time with the [Troxels], provided that that time is balanced with time with the childrens' [sic] nuclear family.' Ibid. These slender findings, in combination with the court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to Granville's already having offered meaningful visitation to the Troxels, show that this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests. The Superior Court's announced reason for ordering one week of visitation in the summer demonstrates our conclusion well: `I look back on some personal experiences.... We always spen[t] as kids a week with one set of grandparents and another set of grandparents, [and] it happened to work out in our family that [it] turned out to be an enjoyable experience. Maybe that can, in this family, if that is how it works out.' Verbatim Report 220-221. As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made. Neither the Washington nonparental visitation statute generallywhich places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be grantednor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.
"Because we rest our decision on the sweeping breadth of § 26.10.160(3) and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Courtwhether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition *675 precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best `elaborated with care.' Post, at 2079 (dissenting opinion). Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter. See, e.g., Fairbanks v. McCarter, 330 Md. 39, 49-50, 622 A.2d 121, 126-127 (1993) (interpreting best-interest standard in grandparent visitation statute normally to require court's consideration of certain factors); Williams v. Williams, 256 Va. 19, 501 S.E.2d 417, 418 (1998) (interpreting Virginia nonparental visitation statute to require finding of harm as condition precedent to awarding visitation)."
530 U.S. at 69-74, 120 S.Ct. 2054 (emphasis added; footnote omitted). The above-emphasized portions from Troxel provide what I contend is the requisite missing link from the grandparent-visitation statute in questionthat the wishes of fit parent(s) concerning such requests must be given "material" and "substantial" weight.
It is due only to the statutory omission of language requiring that "special weight" be given to a fit parent's decision regarding grandparent visitation that I concur in the result herein that the Alabama Grandparent Visitation Act as written is unconstitutional. Section 30-3-4.1(d)(6) requires that the trial court "shall determine if visitation by the grandparent is in the best interests of the child," yet it includes as a factor to consider "the wishes of any parent who is living" only at the end of a list of factors the trial court shall consider in determining the best interests of the child, without statutorily mandating that the trial court give any Troxel "special weight" to the fit parents' wishes.
The facts recited in the main opinion, as found by the trial court, are, to say the least, regrettable. The "fit parents" in this case created, nurtured, cultivated, and encouraged the special relationship between the children and the children's paternal grandparents. To say that these parents established a close and loving relationship between their children and the grandparents is the proverbial classic understatement. Then, in apparent retaliation for the grandparents' inability to continue to provide financial support and resources to the "fit parents," the parents callously pulled the carpet of grandparental love out from under the feet of their own children.
I exhort the Alabama Legislature to again show that the subject of grandparent visitation, in an appropriate constitutional setting, is the favored policy of this State by providing legislation that takes into account the "special-weight" direction regarding the wishes of a fit parent that we have received from Troxel, albeit a plurality decision.
SHAW, Justice (concurring in the result).
I concur in the result reached by the main opinion.
I agree with the holding by the Court of Civil Appeals in J.W.J. v. P.K.R., 976 So.2d 1035, 1040 (Ala.Civ.App.2007), that, "[i]n order to meet the constitutional requirements set out in Troxel [v. Granville, 530 U.S. 57 (2000) ], the [Alabama Grandparent *676 Visitation Act (`the Act')[24]] must contain a presumption that the parent's wishes" are "in the child's best interests" when determining whether to order visitation by a grandparent. In R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001), the then existent version of the Act, which contained no presumption in favor of a parent's decision regarding grandparent visitation and instead provided a presumption in favor of awarding such visitation, was held to be unconstitutional as applied. The main opinion, which was a plurality, stated:
"The fundamental right of a fit parent to decide the issue of unsupervised grandparental visitation, in the absence of harm or potential harm to the child if such visitation is not allowed, requires more respect for the parent's initial decision than is achieved by allowing a trial court to decide what is in the `best interests' of the child and then to substitute its decision for the parent's decision."
R.S.C., 812 So.2d at 372.
Subsequently, in L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (plurality opinion), the main opinion, again a plurality, noted that the portion of the Act that presumed that visitation by a grandparent was in the child's best interest was unconstitutional on its face and due to be severed from the Act. Further, it noted that, under Troxel, "the determination that grandparent visitation will serve the best interest of the child is not alone sufficient to overcome the presumption in favor of a fit parent's fundamental right to rear his or her children." 826 So.2d at 184. Although the Act failed to afford special weight to the parents' own determination regarding visitation of the child with the grandparent, the Court of Civil Appeals attempted to construe the Act in such a way as to remedy such defect:
"Section 30-3-4.1(d), Ala.Code 1975, sets forth a number of factors for the court to consider in determining whether to award visitation to the petitioning grandparents. Most significantly, § 30-3-4.1(d)(6) provides for the consideration of `[o]ther relevant factors in the particular circumstances.' Although the factors listed in § 30-3-4.1(d) do not specifically mention the consideration of a parent's own determination with respect to the child, the factors also do not specifically exclude that factor as a consideration. We conclude that the requirement that the court consider `other relevant factors' under § 30-3-4.1(d) allows the courts to give great weight, as it must, to a parent's decision regarding such visitation in determining whether to grant a grandparent visitation. This presumption in favor of a fit parent's decision regarding grandparent visitation will place a heightened burden of proof on the grandparent petitioning for visitation. Because the fundamental right of a parent is at issue, a grandparent seeking visitation bears the burden of showing, by clear and convincing evidence, that the best interest of the child is served by awarding grandparent visitation.... We conclude that the language of § 30-3-4.1(d) allows the trial court, on a case-by-case basis, to constitutionally apply Alabama's grandparent-visitation statute within the limitations expressed in this opinion."
L.B.S., 826 So.2d at 186-87 (citation omitted).
After the Court of Civil Appeals decided R.S.C. and L.B.S., the legislature undertook to amend the Act:

*677 "In 2003, the Legislature enacted Act No. 2003-383, Ala. Acts 2003, in response to the infirmities identified by this court in the aftermath of Troxel. First, in Act No. 2003-383, the Legislature removed the portion of § 30-3-4.1(e) that had provided that `[t]here shall be a rebuttable presumption in favor of visitation by any grandparent.'... Second, the Legislature specifically amended § 30-3-4.1(d) so as to include `the wishes of any parent who is living' among the factors to be considered in determining whether the best interests of a child would be served by awarding grandparental visitation, making explicit what the main opinion in L.B.S. had held to be implicit in the general direction in former § 30-3-4.1(d)(6) that trial courts are to consider `[o]ther relevant factors' in their best-interests calculus."
Dodd v. Burleson, 932 So.2d 912, 919 (Ala. Civ.App.2005) (plurality opinion).
A majority of the Court of Civil Appeals has subsequently affirmed this rationale and held that the 2003 amendment rectified any facial unconstitutionality found in the Act:
"In 2003, the legislature amended the Grandparent Visitation Act. See Act No. 2003-383, Ala. Acts 2003. Among other changes, the legislature deleted the presumption in favor of grandparent visitation declared unconstitutional in R.S.C. [v. J.B.C., 812 So.2d 361 (Ala.Civ. App.2001),] and expanded subsection 30-3-4.1 to require the trial court to consider, when making its best-interests determination, `[o]ther relevant factors in the particular circumstances, including the wishes of any parent who is living.' (Emphasis added.) In Dodd v. Burleson, 932 So.2d 912, 919 (Ala.Civ.App. 2005), a majority of this court construed the amended statute as having explicitly adopted the presumption in favor of the parent's visitation decision first recognized in L.B.S. [v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) ].
"[T]he current Grandparent Visitation Act does not expressly state that the parent's visitation decision shall be presumed to be in the child's best interests. Rather, as written, the statute simply requires the trial court to consider the parent's wishes along with other factors without specifying that any particular factor should be given any greater weight. However, as stated in L.B.S.:

"`Our supreme court has recognized that "[a] statute may be enacted without containing [a] provision for constitutional requirements but in such terms as not to exclude them and to justify the court in holding that it was intended to be subject to those requirements, which should then be treated as a feature of it." Almon v. Morgan County, 245 Ala. 241, 246, 16 So.2d 511, 516 (1944).'
"826 So.2d at 185. In order to meet the constitutional requirements set out in Troxel [v. Granville, 530 U.S. 57 (2000) ], the statute must contain a presumption that the parent's wishes are presumed to be in the child's best interests. In L.B.S. and Dodd, this court has treated that presumption as an implied part of § 30-3-4.1(d)(6). Thus, the implied presumption is as much a feature of the statute as its plain language. Consequently, the statute is not unconstitutional on its face, as the father argues, for failing to expressly include a presumption in favor of a parent's visitation decisions."
J.W.J., 976 So.2d at 1039-40.
To me, the dispositive issue in this case is whether the Act can be construed so as to give the proper weight to a parent's decision. I have struggled with the laudable *678 attempts of the Court of Civil Appeals to do so.
In reviewing the constitutionality of an act, we presume its validity and seek to sustain it rather than strike it down. House v. Cullman County, 593 So.2d 69, 71 (Ala.1992). Further, it is this Court's duty "`to adopt the construction of a statute to bring it into harmony with the constitution,'" but only "`if its language will permit'" such a construction. Id. at 72 (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 10, 18 So.2d 810, 815 (1944)). That said, we "construe" a statute only when it is ambiguous; if it is unambiguous, then there is no room for the courts to do anything other than to give effect to the legislature's clearly expressed intent. DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala.1998). This is so even if the unambiguous language renders the statute unconstitutional. See Budget Inn of Daphne, Inc. v. City of Daphne, 789 So.2d 154, 160 (Ala.2000) ("This construction, the only one allowed by the unambiguous language of the statute, imposes constitutionally impermissible limitations on the use and enjoyment of nonconforming properties and stands against the great weight of legal authority."). As noted by R.S.C. and L.B.S., the language of the Act, before the 2003 amendment, included a presumption in favor of visitation by grandparents and afforded no presumption in favor of or special weight to be accorded a fit parent's decision in such matters. When the legislature undertook to amend the Act after the Court of Civil Appeals issued its decisions in R.S.C. and L.B.S., it corrected the constitutional infirmity created by the presumption allowing visitation, but it declined to include any language acknowledging the presumption afforded a fit parent's decision. Instead, a fit parent's decision, though acknowledged, was, by the plain language, simply relegated to one of many factors the trial court is allowed to consider. I can only conclude that the legislature intended what § 30-3-4.1 states on its face. There was no room for further judicial construction after the 2003 amendment. Because the legislature, when it amended the Act, explicitly remedied only one of the constitutional defects identified above, and, although recognizing a fit parent's decision, gave that decision no more weight than any other factor, I cannot agree that the Act can be further construed so as to give a parent's decision the weight the legislature did not provide. I agree that the Act is unconstitutional on its face, and I therefore concur in the result.
STUART, J., concurs.
MAIN, Justice (dissenting).
The Alabama Grandparent Visitation Act, § 30-3-4.1, Ala.Code 1975 ("the Act"), revolves around the relationship of three distinct groups of people: children, parents, and grandparents. In its present form, the Act is a legislative attempt, when visitation is contested, to determine the best interests of the childrennot the parents or the grandparents. The main opinion has focused on the rights of the parents rather than on the best interests of the children.
Historically, minor children and mentally incompetent persons have been treated differently from competent adults, both criminally and civilly. The state necessarily injects itself into the affairs of children and the mentally incompetent when they are in need of protection because their developmental differences and their environmental restraints render them more vulnerable than competent adults. Children do not make decisions in the same manner as do adults because children are not as neurologically developed and are *679 not free to "escape" their environment. It is clear that the law treats children differently than it treats adults; the question thus becomes: What is the appropriate standard in interpreting statutes concerned with children? As noted in the few examples that follow, Alabama statutes and caselaw from both this Court and the United States Supreme Court treat juveniles differently from adults in both civil and criminal matters.
(1) Juveniles are not eligible for the death penalty. See Ex parte Adams, 955 So.2d 1106 (Ala.2005), relying on Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding unconstitutional the imposition of the death penalty for capital-murder defendants when the murder was committed before the defendant had reached the age of 18).
(2) The United States Supreme Court recently held that imposing a penalty of life imprisonment without the possibility of parole on a juvenile was unconstitutional for offenses other than homicide offenses:
"Roper [v. Simmons, 543 U.S. 551 (2005),] established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U.S., at 569. As compared to adults, juveniles have a `"lack of maturity and an underdeveloped sense of responsibility"'; they `are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are `not as well formed.' Id., at 569-570. These salient characteristics mean that `[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' Id., at 573. Accordingly, `juvenile offenders cannot with reliability be classified among the worst offenders.' Id., at 569. A juvenile is not absolved of responsibility for his actions, but his transgression `is not as morally reprehensible as that of an adult.' Thompson [v. Oklahoma, 487 U.S. 815,] 835 [(1988)] (plurality opinion).
"No recent data provide reason to reconsider the Court's observations in Roper about the nature of juveniles. As petitioner's amici point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. as Amici Curiae 16-24; Brief for American Psychological Association et al. as Amici Curiae 22-27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of `irretrievably depraved character' than are the actions of adults. Roper, 543 U.S., at 570. It remains true that `[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.' Ibid. These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.
". . . .
"It follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis."
Graham v. Florida, ___ U.S. ___, ___, 130 S.Ct. 2011, 2026, 176 L.Ed.2d 825 (2010).
*680 (3) A separate advisement of rights applies for juveniles than for adults with regard to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights. See Ex parte Hall, 863 So.2d 1079 (Ala.2003), and § 12-15-202, Ala.Code 1975.
(4) An individual under a certain age may apply for treatment by the courts as a youthful offender. See § 15-19-1 et seq., Ala.Code 1975.
(5) Age-based restrictions exist as to when an individual is legally permitted to purchase and to consume alcohol products. See § 28-1-5, Ala.Code 1975. Additionally, adults may face criminal charges with regard to providing alcohol to minors at open house parties. See 13A-11-10.1, Ala. Code 1975. See also Owens v. State, 19 So.3d 252 (Ala.Crim.App.2009) (parents convicted of violation of § 13A-11-10.1 for hosting party at their residence and on their property at which minors consumed alcohol).
(6) Age-based restrictions exist as to when an individual is permitted to lawfully operate motorized vehicles on the roadways. See §§ 32-6-3(a), 32-6-7, 32-6-7.2, 32-6-8, Ala.Code 1975.
(7) Age-based restrictions apply to the ability to contract to marriage: the minimum age at which a person may contract to marriage is 16 years, see § 30-1-4, Ala.Code 1975, and the consent of the parents or a guardian is required for individuals at least 16 years of age and under 18 years, see § 30-1-5, Ala.Code 1975.
(8) Courts may order medical treatment for a child in contravention of the parents' religious beliefs when the child's health is at stake. § 26-14-7.2, Ala.Code 1975.
(9) With regard to child support, different requirements and provisions apply for children under the age of 19 and those over the age of 19. See Ex parte Bayliss, 550 So.2d 986 (Ala.1989), and its progeny.
Furthermore, Alabama statutes and caselaw have historically governed certain aspects of the parent-child relationship, and the standard applied by our courts in these cases has consistently been the best interests of the child:
(1) In terminating parental rights, the overriding consideration is the best interests of the child. Ex parte J.R., 896 So.2d 416 (Ala.2004) (best-interests-of-the-child standard governs the termination of parental rights).
(2) In dependency proceedings, the appropriate standard to be applied is the best interests of the child. D.B. v. K.B., 67 So.3d 114, 120 (Ala.Civ.App.2011) (applying § 12-15-314(a)(4), Ala.Code 1975, "allowing a juvenile court, after adjudicating a child dependent, to `[m]ake any other order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child'").
(3) In many custody proceedings, the appropriate standard to be applied is the best interests of the child. Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996) (best-interests-of-the-child standard applied in original custody determination); Ex parte Blackstock, 47 So.3d 801 (Ala.2009) (if prior judgment awarded joint physical custody, best-interests-of-the-child standard applies in subsequent custody-modification proceeding); Ex parte Murphy, 670 So.2d 51 (Ala.1995) (modification of prior custody award requires that party seeking modification prove not only a material change in circumstances, but also that the modification will materially promote the best interests of the child, thus offsetting the disruptive effect of uprooting the child).
(4) In adoption proceedings, the appropriate standard to be applied is the best *681 interests of the child. §§ 26-10A-24 and -25, Ala.Code 1975.
(5) When a minor child seeks an abortion, the courts apply the best-interests-of-the-minor standard to determine whether the minor must first obtain parental consent. See § 26-21-4(f)(2), Ala.Code 1975.
The main opinion focuses on the liberty interest of the parents, almost as though the children were chattel. I would focus on the best interests of the child.
Moreover, it is a well settled rule of statutory construction that when this Court reviews the constitutionality of a statute, it should first seek to uphold the statute.
"In Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000), this Court restated the long-standing rules governing review of acts of the Legislature under constitutional attack:
"`"In reviewing [a question regarding] the constitutionality of a statute, we `approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.'" Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 159 (Ala.1991) (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944)). Moreover, "[w]here the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction [that] would uphold it." McAdory, 246 Ala. at 10, 18 So.2d at 815. In McAdory, this Court further stated:
"`"[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law."
"`246 Ala. at 9, 18 So.2d at 815 (citation omitted). We must afford the Legislature the highest degree of deference, and construe its acts as constitutional if their language so permits. Id.'"
Rice v. English, 835 So.2d 157, 163-64 (Ala.2002).
In E.H.G. v. E.R.G., [Ms. 2071061, March 12, 2010] 73 So.3d 614, ___ (Ala. Civ.App.2010), the Alabama Court of Civil Appeals upheld the Act against a constitutional challenge. However, the Court of Civil Appeals engrafted on the Act a standard of "harm" that is not found in the statute.
"As presently drafted, the Act requires a trial court in a grandparent-visitation case to consider `[o]ther relevant factors in the particular circumstances. . . .' Ala.Code 1975, § 30-3-4.1(d)(6). Since we hold that a showing of harm to the child resulting from the denial of visitation is a prerequisite to any award of visitation under the Act, we conclude that subsection (d)(6) necessarily encompasses that showing as a `relevant factor' and that the Act is, therefore, facially valid. See L.B.S. [v. L.M.S.], 826 So.2d [178,] 185 [(Ala.Civ.App.2002)] (holding that the judiciary could adopt a construction of a statute that would uphold its constitutionality). We emphasize, however, that the showing of harm is not to be weighed along with the other factors *682 in § 30-3-4.1(d)(6). Rather, . . . a court considering a petition for grandparent visitation must first presume the correctness of the decision of a fit, natural, custodial parent as to grandparent visitation and then determine whether the petitioning grandparent has presented clear and convincing evidence that the denial of the requested visitation will harm the child. If so, the court may then weigh the other statutory factors to determine the mode and extent of grandparent visitation necessary to alleviate the harm to the child without further infringing on the fundamental rights of the parents."
73 So.3d at 629 (emphasis added). That court thus applied a standard that did not exist at the time of trial as the basis for reversing the trial court's judgment on a ground the trial court never considered, concluding that "[b]ecause the trial court awarded visitation to the paternal grandparents without the requisite showing of harm, the trial court unconstitutionally applied the Act to the parents." 73 So.3d at 630. In rejecting the best-interests-of-the-child standard as written by the legislature into the Act and grafting onto it a standard of harm to the child, the Court of Civil Appeals chose to depart from its prior decisions in Dodd v. Burleson, 932 So.2d 912 (Ala.Civ.App.2005), and Dodd v. Burleson, 967 So.2d 715 (Ala.Civ.App. 2007), both plurality decisions. Instead, the Court of Civil Appeals relied heavily on a case decided by the Supreme Court of Tennessee, Hawk v. Hawk, 855 S.W.2d 573 (Tenn.1993), in which the court invalidated Tennessee's grandparent-visitation statute because it was inconsistent with Tennessee's constitution.
The Court of Civil Appeals' reasoning in E.H.G. was also grounded in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), a plurality opinion in which the United States Supreme Court reviewed a Washington state statute that provided that any person could petition a court for visitation with a child at any time, and that the court could award visitation rights to any person when such visitation "may serve the best interest of the child." § 26.10.160(3), Revised Code of Washington. The plurality found the Washington state nonparental-visitation statute overly broad and concluded that it unconstitutionally infringed on the petitioner's fundamental parental right to make decisions regarding the care, custody, and control of her children. The problem, the plurality stated, was not that the court had intervened, "but that when it did so, it gave no special weight at all to [the parent's] determination of her daughters' best interests." 530 U.S. at 68, 120 S.Ct. 2054. The plurality opinion in Troxel did not establish a "harm" standard and, in fact, did not consider it.
"Because we rest our decision on the sweeping breadth of § 26.10.160(3) and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Courtwhether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best `elaborated with care.' Post, at [101] (dissenting opinion). Because much state-court adjudication in this context occurs on a case-by-case basis, we would *683 be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter."
530 U.S. at 73, 120 S.Ct. 2054 (footnote omitted).
In his dissent in Troxel, Justice Stevens not only noted that it was unnecessary for the Court to consider a "harm" standard in that case, but also concluded that a showing of harm is not required for a grandparent-visitation statute to pass constitutional muster.
"The second key aspect of the Washington Supreme Court's holdingthat the Federal Constitution requires a showing of actual or potential `harm' to the child before a court may order visitation continued over a parent's objectionsfinds no support in this Court's case law. While, as the Court recognizes, the Federal Constitution certainly protects the parent-child relationship from arbitrary impairment by the State, see infra this page and [88-89,] we have never held that the parent's liberty interest in this relationship is so inflexible as to establish a rigid constitutional shield, protecting every arbitrary parental decision from any challenge absent a threshold finding of harm."
530 U.S. at 85-86, 120 S.Ct. 2054 (Stevens, J., dissenting) (emphasis added). Justice Kennedy came to a similar conclusion in his dissent in Troxel, 530 U.S. at 93, 120 S.Ct. 2054 (Kennedy, J., dissenting).
Because Troxel was a plurality decision and because seven of nine Justices found it unnecessary to address the application of a harm standard, Troxel cannot be considered the source of any holding that a grandparent-visitation statute can be considered constitutional only if it requires proof that a denial of visitation would harm the child. The flaw in the Washington state statute pointed out by the plurality in Troxel was that "a parent's decision that visitation would not be in the child's best interest [was] accorded no deference." 530 U.S. at 67, 120 S.Ct. 2054.
The main opinion emphasizes "[t]he substantive fundamental right of parents to make decisions regarding the `care, custody, and control' of their children." 73 So.3d at 644 (quoting Troxel, 530 U.S. at 66, 120 S.Ct. 2054). The main opinion concludes that the Act is unconstitutional in its entirety because no part of the Act "defers to the fundamental right of the parent or to the presumption in favor of a parent's decisions regarding grandparent visitation." 73 So.3d at 650. I disagree. I would hold that the Act is not unconstitutional on its face and that a determination regarding whether visitation with a grandparent would be in a child's best interests should be made on a case-by-case basis. The Act, as originally enacted in 1999, provided, in pertinent part:
"(d) Upon the filing of an original action or upon intervention in an existing proceeding pursuant to subsections (b) and (c), the court shall grant any grandparent of the child reasonable visitation rights if the court finds that the best interests of the child would be served by the visitation. In determining the best interest of the child, the court shall consider the following:
". . . .
"(6) Other relevant factors in the particular circumstances.
"(e) The court shall make specific written findings of fact in support of its rulings. There shall be a rebuttable presumption in favor of visitation by any grandparent. . . ."
§ 30-3-4.1, Ala.Code 1975. Effective September 1, 2003, the legislature amended the Act. Pursuant to the 2003 amendment, the above-quoted portion of the Act now provides:

*684 "(d) Upon the filing of an original action or upon intervention in an existing proceeding pursuant to subsections (b) and (c), the court shall determine if visitation by the grandparent is in the best interests of the child. Visitation shall not be granted if the visitation would endanger the physical health of the child or impair the emotional development of the child. In determining the best interests of the child, the court shall consider the following:
". . . .
"(6) Other relevant factors in the particular circumstances, including the wishes of any parent who is living.
"(e) The court shall make specific written findings of fact in support of its rulings. . . ."
§ 30-3-4.1, Ala.Code 1975. The 2003 amendment was responsive to many of the factors discussed in the plurality decision in Troxel. For example, the amendment added to § 30-3-4.1(d) a prohibition against grandparental visitation if that visitation would endanger the child's physical health or impair the child's emotional development.[25] The amendment also provides that the trial court is to consider the parent's wishes among the other factors for the court's consideration in determining whether grandparent visitation is in the child's best interest. Additionally, the amendment removed the rebuttable presumption in favor of grandparent visitation from § 30-3-4.1(e).
For the foregoing reasons and in the face of existing precedent from this Court and from the Court of Civil Appeals and the lack of a requirement that courts consider a harm standard in evaluating the grandparent-visitation issue, I see no need to declare the Act unconstitutional. I agree with Judge Pittman, who, in his dissent in E.H.G., stated:
"I dissent. The main opinion represents a complete departure from the analytical framework I espoused in the main opinion in Dodd v. Burleson, 932 So.2d 912 (Ala.Civ.App.2005), appeal after remand, 967 So.2d 715 (Ala.Civ.App. 2007). As I made clear in Dodd, Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), does not stand for the proposition that states must adopt a harm standard in order for their grandparent-visitation statutes to conform with due-process guaranties afforded by the Fourteenth Amendment. Since Troxel was decided, courts in a number of states have determinedconsistent with the main opinion in Doddthat harm to a child is not a constitutionally required prerequisite for a grandparent-visitation award contrary to the wishes of fit parents. In re Adoption of C.A., 137 P.3d 318, 326-27 (Colo.2006); Vibbert v. Vibbert, 144 S.W.3d 292, 294-95 (Ky.Ct.App.2004); Rideout v. Riendeau, 761 A.2d 291, 300-01 (Me.2000); Harrold v. Collier, 107 Ohio St.3d 44, 52, 836 N.E.2d 1165, 1172 (2005) (`nothing in Troxel suggests that a parent's wishes should be placed before a child's best interest'); and Hiller v. Fausey, 588 Pa. 342, 363-66, 904 A.2d 875, 888-90 (2006)."[26]
*685 I would hold that the child's best interests, not the "interests" of the parents, is the determinative standard for deciding whether to award visitation between a grandparent and a grandchild in the face of the contrary wishes of fit parents. The Act contains both a determination that a court should not require visitation with a child's grandparents if the child would be physically or emotionally harmed by the visitation, § 30-3-4.1(d), and a requirement that the trial court in deciding whether to order visitation consider "the wishes of any parent who is living," § 30-3-4.1(d)(6). Therefore, in my view, the Act is constitutional. In the case before us, the trial court reviewed all the factors in § 30-3-4.1(d), including the factors that protect the right of the parents and the factors that determine the best interests of the children. The trial court considered the wishes of the parents, both of whom are living, and found that visitation would not endanger the physical health of the children or impair their emotional development. Moreover, the guardian ad litem appointed for the children submitted a written report finding that continued alienation from the grandparents was not in the best interests of the children. Pursuant to the Act, the trial court then ordered visitation between the grandparents and the children.
I agree that a parent's right to the care, custody, and control of his or her child is fundamental. However, that right is not absolute. As Justice Bolin, writing for the Court, so aptly stated in Ex parte M.D.C., 39 So.3d 1117, 1128 (Ala.2009):
"A parent has a fundamental liberty interest in the care, custody, and management of his or her child. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this interest is not absolute; it `is limited by the compelling government interest in the protection of childrenparticularly where the children need to be protected from their own parents.' Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir.1997)."
As described heretofore, courts do intervene to protect the rights of children who, unlike adults, cannot protect themselves. The government has no role whatsoever in the relationship between parents and grandparents and has no right to interfere with their behavior, because they are adults. The government does have a role protecting a child if an adult has disregarded his or her responsibility toward that child. Unlike the main opinion, I do not conclude that the Act is unconstitutional on its face. I believe the focus in grandparent visitation, as it is in other areas of juvenile and domestic-relations law in Alabama, should be on the children and that the appropriate standard is the best interests of the child.
I would affirm that portion of the judgment of the Court of Civil Appeals that concludes that the Act is not unconstitutional. I would reverse that portion of the judgment that judicially engrafted a harm standard into the Act and reversed the judgment of the trial court, and I would remand the case to the Court of Civil Appeals for that court to affirm the trial court's judgment awarding visitation to the grandparents. Therefore, I respectfully dissent.
COBB, C.J., concurs.
NOTES
[1] Although the Court of Civil Appeals upheld the Act, it reversed the trial court's decision awarding the grandparents visitation; that reversal is the subject of the grandparents' appeal.
[2] Furthermore, nothing in the Act requires a narrow tailoring of relief to the least restrictive means of addressing the State's interest (e.g., modes and duration of visitation).
[*] Although Justice Main and Justice Wise were not members of this Court when this case was orally argued, they have viewed the video recording of that oral argument.
[3] All Scripture quotations are from the New American Standard Bible.
[4] See, e.g., Hamilton Vreeland, Jr., Hugo Grotius: The Father of the Modern Science of International Law (1917).
[5] Hugo Grotius, The Rights of War and Peace, The Preliminary Discourse, ¶ 15 (1625).
[6] John Locke, Two Treatises of Government §§ 55, 58. Like Samuel von Puffendorf, Locke also discussed the limitations on that authority and how it might be forfeited.
[7] His name is often also spelled "Pufendorf"; however, because it has previously been spelled "Puffendorf" in the decisions of this Court, we continue to use that spelling here.
[8] See, e.g., Alden v. Maine, 527 U.S. 706, 766-67, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (Souter, J., dissenting), citing Blackstone, and noting his reliance on Puffendorf and Locke. Indeed, in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), one of the earliest decisions of the United States Supreme Court, Blackstone was quoted as citing Puffendorf on the subject of sovereign immunity. 2 U.S. (2 Dall.) at 442. Puffendorf's writings were also directly cited before and by the United States Supreme Court in the early days of our republic; Justice Joseph Story listed Puffendorf next to Grotius and Emmerich de Vattel as legal authorities; see The Nereide, 13 U.S. (9 Cranch) 388, 437, 3 L.Ed. 769 (1815); see also Brown v. United States, 12 U.S. (8 Cranch) 110, 132, 134, 140, 3 L.Ed. 504 (1814) (Story, J., dissenting). He is most frequently cited, however, both in the decisions of the United States Supreme Court and this Court, for his illustration from Bolognian law of how legal principles should never be interpreted to produce an absurd result. See, e.g., Holy Trinity Church v. United States, 143 U.S. 457, 461, 12 S.Ct. 511, 36 L.Ed. 226 (1892); Lash v. State, 244 Ala. 48, 52, 14 So.2d 229, 231 (1943).

For further discussion of Puffendorf's influence, see Bernard Baily, The Ideological Origins of the American Revolution, 43 (1992), noting that Puffendorf's writings were published in conjunction with those of Locke, Edward Coke, and Grotius; see also Thomas C. Gray, Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought, 30 Stan. L.Rev. 843, 860 (1978) ("Except for Grotius, the authors of these public law treatises are little known and almost never read today, but in the 18th and early 19th centuries, the works of Pufendorf, [Jean Jacques] Burlamaqui, Vattel and [Thomas] Rutherforth had prestige and influence, and helped shape the constitutional ideas of the American colonists.").
[9] 2 Samuel von Puffendorf, On The Duty of Man and Citizen ch. 3, ¶ 1 (1682) (Frank Gardner Moore, trans. 1925). Puffendorf went on to discuss the limitations on those parental rights and the cases in which they might be forfeited through misuse or abandoned to another. Id. at ¶ 4, 7, 9.
[10] See, e.g., Gary L. McDowell, The Limits of Natural Law: Thomas Rutherforth and the American Legal Tradition, 37 Am. J. Juris. 57, 58 (1992), noting that Rutherforth's "Institutes of Natural Law was a work widely read and cited among those of the Founding generation and of the first generation under the Constitution of 1787."
[11] Thomas Rutherforth, Institutes of Natural Law 166 (3d ed. 1799).
[12] Although this case was originally decided by the Alabama Supreme Court, it was reassigned to the newly created Court of Appeals on rehearing, and both decisions were reported as a single case.
[13] Although the applicable statute, § 12-15-319, Ala.Code 1975, does not use the term "fit," it nonetheless makes the unfitness of the parents a preliminary requirement for the termination of parental rights:

"If the juvenile court finds ... that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents...."
§ 12-15-319(a). The statute goes on to list factors that may be considered by the court, including abandonment, abuse, illness, and criminal activity. (Note that under § 12-15-311, Ala.Code 1975, a child may be declared "dependent," as that term is defined in § 12-15-102, without terminating parental rights.)
[14] The best-interests standard is urged by the United Nations as a stand-alone standard to be used by legislative bodies of national governments. "In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration." Convention on the Rights of the Child, Nov. 20, 1989, art. 3, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990) (not ratified by the United States). The United Nations Convention would take the best-interests-of-the-child standard, used for decision-making, and turn it into an independent right of the child that would offset the fundamental right of parents.
[15] In addition to looking out for a child as to whom visitation might be sought, parents are called upon every day to make decisions that simultaneously affect not just a single child, but siblings of that child and the parent's spouse. What is best for one child may not be best for others, or it may be seriously inconvenient or even detrimental for the family as a whole. Also, a parent must often weigh short-term harm against long-term harm. Perhaps a short-term adversity will work to benefit a child by developing a sense of sacrifice for the greater good of the family, or patience, or perseverance. Or perhaps the short-term harm of hurt feelings would be better than a long-term wound caused by an adversary proceeding where the parent is forced to openly disclose concerns about a grandparent.
[16] Of course, despite the well founded presumption that parental decision-making is motivated by the best interests of the child, not every parental decision meets this standard. The thought of empowering the government to explore and evaluate the subjective motivations of parents and their decisions, however, is even more alarming than the thought of empowering the government to second-guess the effects of parental decisions.
[17] Similarly, all the Justices on the Alabama Supreme Court recognize today the fundamental nature of the parents' right to the care, custody, and control of their children.
[18] As discussed in the opinion of the Court of Civil Appeals in this case, Virginia's Supreme Court is only one of a great majority of courts throughout the nation that have rejected a mere "best interests" standard and explained that the Constitution requires a showing of harm and/or other "compelling" state interest. E.H.G. v. E.R.G., [Ms. 2071061, March 12, 2010] 73 So.3d 614, ___ (Ala.Civ.App. 2010).
[19] With respect to the constitutional requirement that any intrusion into parental decision-making regarding children's associations must be narrowly tailored to the least restrictive means necessary to address the state's interest, I made the following observations in R.S.C.:

"Overnight and other unsupervised `visitation' removes children from the presence and control of their parents and gives complete control and authority over the child for a period of time to another adult, essentially effecting a temporary or `partial custody.' Parents' interests in the nurture, upbringing, companionship, care, and custody of their children are thus implicated in ways that they are not with occasional, supervised visits. In Troxel, itself, the plurality made special note of the fact that there was `no allegation that [the parent] ever sought to cut off visitation entirely,' but simply preferred to restrict visitation to `one short visit per month and special holidays.' 530 U.S. at 71, 120 S.Ct. 2054. At trial, the parent asked the court to order `only one day of visitation per month (with no overnight stay) and participation in the Granville family's holiday celebrations.' Id. at 71, 120 S.Ct. 2054. The Supreme Court criticized the trial court's `failure to accord significant weight to [the parent's] already having offered meaningful visitation' in this regard to the grandparents. Id. at 72, 120 S.Ct. 2054."
R.S.C., 812 So.2d at 369-70 (some emphasis omitted; footnotes omitted).
[20] In L.B.S., I suggested that the "substantial harm" necessary to justify state interference in the decisions of a parent regarding visitation with others would be "serious psychological or emotional harm." 826 So.2d at 191. I also suggested that it is the "net effect" (i.e., weighing the advantages and disadvantages of the visitation decision against one another) of the court's substitution of its decision for that of the parent that must be considered in this regard. As to these two suggestions, I wrote as follows:

"I am acutely aware that, in many cases, where a child has enjoyed a substantial relationship with a grandparent, arbitrarily depriving the child of the relationship could cause the child serious psychological or emotional harm.8 In In re Custody of Smith, [137 Wash.2d 1, 969 P.2d 21 (1998),] the Washington Supreme Court also recognized that arbitrarily depriving a child of a substantial relationship with a third person could cause `severe psychological harm.' 137 Wash.2d at 20, 969 P.2d at 30. See also Troxel, 530 U.S. at 99, 120 S.Ct. 2054 (Kennedy, J., dissenting). No showing of harm was required by the Washington statute at issue, however, and the court cited Washington state law for the proposition that `a state can only intrude upon a family's integrity pursuant to its parens patriae right when "parental actions or decisions seriously conflict with the physical or mental health of the child."' 137 Wash.2d at 18, 969 P.2d at 29 (citation omitted; emphasis added). See also Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).
"Parents often are called upon to decide between competing alternatives, each of which may entail both benefits and detriments for their children. I conclude that a court may not constitutionally substitute its decision for that of a fit custodial parent as to what, if any, grandparent visitation is in a child's overall best interest, unless the net effect of the court's substituting its decision for that of the parent's will be to prevent substantial harm to the child.
"I also note that Ala.Code 1975, § 30-3-4.1, allows a court to override the decision of a parent and order what the court may deem to be `reasonable' visitation. The statute does not expressly state that the court may order only visitation narrowly tailored to address an adjudged harm. Yet, as noted previously, the interference with a fundamental right for the purpose of serving a compelling state interest must be done in a manner that is least restrictive of the fundamental right and most closely tailored to serve that compelling state interest. See Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); Beagle v. Beagle, 678 So.2d [1271,] at 1275 [(Fla.1996)] (recognizing in the context of a challenge to Florida's grandparent-visitation statute that the statute must meet a compelling state interest `through the use of the least intrusive means'). Limiting a court's interference with parental authority to the extent necessary, or reasonably necessary, to prevent or alleviate the adjudged harm would result in less interference with parental authority. Compliance with such a requirement conceivably could entail adjustments to the number or duration of visits, limitations on the nature of the visitation (e.g., a restriction of visitation to supervised visits only) and/or to other conditions or restrictions.
"8 In Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973), this court affirmed a trial court's judgment awarding custody of a child to foster parents over the objection of his natural mother. The child had been removed from the custody of his mother at an age of less than two years and was `taken into a home [the foster parents'] and given the same comfort, love and affection over a period of two and a half years which was given to the natural children in the home.' 49 Ala.App. at 661, 275 So.2d at 341. This court explained that to remove the child `from the only home and parents he knows and send him to an uncertain future in a distant state with strangers, even though one be a natural parent, could not avoid being [a] traumatic experience which could be calculated to be extremely damaging.' Id.
"`[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays "in promot[ing] a way of life" through the instruction of children as well as from the fact of blood relationship.'
"Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also Rideout v. Riendeau, 761 A.2d 291 (Me. 2000) (upholding finding that grandparents had acted as children's parents for significant periods of time, and holding that a statute requiring a sufficient existing relationship between grandparents and children in order for grandparents to petition for visitation served a compelling state interest and was narrowly tailored to serve that interest)."
L.B.S., 826 So.2d at 191-92 (footnote omitted).
[21] Even aside from the question of a "voluntary forfeiture," if a parent is willing to subject a child to the type and severity of psychological harm that can result from the abrupt and complete removal of the child from the custody of the only parent figure he or she has known for some extended period, one may reasonably question the fitness of that parent to have sole custody of that that child. See generally Ex parte Terry, 494 So.2d at 632 (quoting Mathews, 428 So.2d at 59). Compare D.C. v. CO., 721 So.2d 195 (Ala.Civ.App. 1998); R.K. v. R.J., 843 So.2d 774 (Ala.Civ. App.2002).
[22] By the same token, the issue of parental rights vis-á-vis the authority of the State, if any, to mandate grandparent visitation based upon the government's determination of what is in the "best interests of the child" is a different matter entirely from each of that litany of things that are discussed by the dissent and that include the following: (1) whether the State may treat a child like an adult for purposes of a criminal proceeding arising out of the child's conduct or for purposes of the child's interactions with police officers; (2) whether the State may impose age limits concerning the purchase or consumption of alcohol, the operation of a motor vehicle, and the ability to enter into a marriage contract; (3) whether the State may, over a parent's objection, provide "medical care or treatment for a child when the care or treatment is necessary to prevent or remedy serious harm to the child," Ala.Code 1975, § 26-14-7.2(b), or waive the requirement of parental consent to an abortion procedure; and (4) whether the State can require the payment of child support for children who are not yet adults. See ___ So.3d at ___ (Main, J., dissenting).

In each of the above-described instances (1) the child or the child's interests either are being seriously harmed or are at risk of serious harm and (2) the need for the State's intervention to address that harm or risk of harm is the result of the child's immature decision-making skills or concerns about the parents willingness or ability to protect the child. Section 30-3-4.1, Ala.Code 1975, reflects no such considerations.
[23] Essentially, the dissent appears to equate the state's right to intervene for proposes of protecting a child from harm (an obligation that normally falls upon the parents) with the state's right to intervene based solely upon what it perceives to be in a child's best interests. Although the former is founded in the common-law doctrine of parens patriae and reflects a normal function of the state's police power, the latter finds no substantial basis in our law. See 1 William Blackstone, Commentaries on the Laws of England *452 (footnotes omitted; citations omitted); William Macpherson, A Treatise on the Law Relating to Infants 106-111 (1843); 2 Joseph Story, Commentaries on Equity Jurisprudence in England and America § 1341 (1886). See also Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (rejecting the State's attempt to support application of a compulsory high-school-attendance law to Amish children, stating: "This case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred. The record is to the contrary, and any reliance on that theory would find no support in the evidence." (footnote omitted; emphasis added)); R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225, 1227-28 (Ala.1990) ("The common law deems parental care for children not only an obligation, but also an inherent right: `In such matters as deciding on the need for surgical or hospital treatment, the wishes of young children are not consulted, nor their consent asked when they are old enough to give expression thereto. The will of the parents is controlling, except in those extreme instances where the state takes over to rescue the child from parental neglect or to save its life....' 59 Am.Jur.2d. Parent and Child § 48 at 194 (1987)." (some emphasis omitted; some emphasis added)). See Ex parte Department of Mental Health, 511 So.2d 181, 185 (Ala. 1987) (The juvenile court system "`is rooted in the concept of parens patriae, that the state will supplant the natural parents when they fail in that role.' In re F.C., 484 S.W.2d 21, 25 (Mo.App.1972)." (emphasis added)); Prince v. State, 19 Ala.App. 495, 495, 98 So. 320, 320 (1923) ("`The provision of the statute [for juvenile detention] is a provision by the state, under necessity, as parens patriae, for the custody of neglected children, incorrigible, or criminally inclined children, and is intended to supply to them that parental custody and care and restraint which their welfare, and the interests of the state in the welfare of the children, require, which parental custody, or the parental right to the custody, the parents have for any reason surrendered or lost.'" (quoting 1 Wharton's Criminal Law 473 (11th ed.))); see also G.H. v. Cleburne County Dep't of Human Res., 62 So.3d 540, 544 (Ala.Civ.App.2010) (Department of Human Resources acts as parens patriae when it files a dependency petition); Ex parte State ex rel. Echols, 245 Ala. 353, 17 So.2d 449 (1944).
[24] Ala.Code 1975, § 30-3-4.1.
[25] I recognize the distinction between the refusal to grant visitation if visitation would harm the child and the granting of visitation against the parent's wishes if the deprivation of visitation would cause harm to the child. The amendment to the Act is couched in terms of the former, whereas the discussion in Troxel and its progeny addresses the latter.
[26] According to a summary in the grandparents' reply brief, 18 states utilize the harm standard. A number of other states have rejected the harm standard or utilize the best-interests-of-the-child standard.